## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

|  |  |
|---|---|
| TIMMEKA HARRIS-REESE, *Individually and as Parent and Next Friend of Z.R.*, and DOUGLAS M. REESE, JR., *Individually and as Parent and Next Friend of Z.R.*,<br><br>　　　Plaintiffs,<br><br>　　　v.<br><br>UNITED STATES OF AMERICA,<br><br>　　　Defendant. | Civil Action No. TDC-19-1971 |

## MEMORANDUM OPINION

Plaintiffs TimMeka Harris-Reese ("Ms. Harris-Reese") and Sergeant Douglas M. Reese, Jr. ("Sgt. Reese") have filed suit against the United States of America ("the Government") asserting claims under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671–80 (2018), based on allegedly negligent medical treatment and a lack of informed consent relating to a surgery performed on their minor child, Z.R., at the Walter Reed National Military Medical Center ("WRNMMC") in Bethesda, Maryland. After denying summary judgment to the Government on the issue of the employment status of the attending anesthesiologist for the surgery, the Court conducted an 11-day bench trial on liability and damages. Pursuant to Federal Rule of Civil Procedure 52(a), the Court now provides its findings of fact and conclusions of law. For the reasons set forth below, the Court finds that the Government is liable for medical negligence by physicians who provided medical care to Z.R. Accordingly, the Court will enter judgment for Plaintiffs and award damages as detailed in the accompanying Order.

## INTRODUCTION

On July 19, 2019, Plaintiffs initiated this FTCA action against the Government, seeking to recover damages for allegedly negligent medical care during and in relation to a routine Bilateral Myringotomy Tympanostomy and Tubes ("BMTT") and adenoidectomy surgery performed on Z.R. at WRNMMC on September 13, 2016. In Count One of the Complaint, Plaintiffs allege that the surgical team assigned to Z.R.'s case, consisting of attending otolaryngologist (ear, nose, and throat physician, or "ENT") Dr. Scott Brietzke, resident ENT Dr. Thomas Townes, attending anesthesiologist Dr. Christine Gerbstadt, and resident anesthesiologist Dr. Peter Willett breached the applicable standards of care and thereby caused Z.R. to go into cardiac arrest and suffer an anoxic brain injury, which resulted in permanent brain damage. In Count Two, Plaintiffs allege that these same physicians breached the duty of informed consent by failing to disclose the material risks and consequences associated with the surgery in light of the fact that Z.R. was at heightened risk from being placed under anesthesia because he was a one-year-old child with both hemoglobin SC ("sickle cell") disease and reactive airway disease. At the conclusion of the trial, Plaintiffs, the Government, and Intervenor Donald L. Mooney Enterprises, LLC submitted supplemental trial briefs, which the Court has reviewed and considered in formulating its findings of fact and conclusions of law.

## FINDINGS OF FACT

During the course of the bench trial, which began on March 21, 2022 and ended on April 6, 2022, the following witnesses testified: (1) Plaintiffs Ms. Harris-Reese and Sgt. Reese; (2) six current or former health care providers working at WRNMMC on the day of the surgery, consisting of Dr. Brietzke, Dr. Townes, Dr. Gerbstadt, Dr. Willett, WRNMMC Chief of Anesthesiology Dr. Kyle Berry, and Kevin Gutierrez, a circulating nurse who participated in the surgery; (3) Plaintiffs' medical expert witnesses, consisting of anesthesiologist Dr. William Greeley, Professor of

2

Anesthesiology and Pediatrics at the Duke University School of Medicine, ENT Dr. Charles Myer, Professor of Pediatric Otolaryngology and Residency Program Director at the University of Cincinnati College of Medicine, and pediatric neurologist and epileptologist Dr. Stephen Nelson, Professor of Pediatrics, Neurology, Neurosurgery, and Psychiatry at the Tulane University School of Medicine; (4) the Government's medical expert witnesses, consisting of anesthesiologist Dr. Gregory Hammer, Professor of Anesthesiology and Pediatrics at the Stanford University School of Medicine, ENT Dr. Ken Kazahaya, Associate Professor of Clinical Otorhinolaryngology at the University of Pennsylvania School of Medicine, and neurologist Dr. Richard Katz, Professor of Clinical Neurology at the Washington University School of Medicine in St. Louis, Missouri; (6) Plaintiffs' life care planning expert witness Dr. Elizabeth Davis; (7) Plaintiffs' expert economist Dr. Thomas Borzilleri and Defendants' expert economist Chadwick Staller; (8) corporate designee Andrew Mooney of Donald L. Mooney Enterprises, LLC; and (9) two employees of the Defense Health Agency, consisting of Jeremy Schneider and Melissa Oliva. Based on the trial testimony, as well as the deposition testimony and exhibits admitted at trial, the Court finds the following facts.

**I.    Medical History**

Z.R. was born on September 1, 2015 to Ms. Harris-Reese and Sgt. Reese. During his first year of life, Z.R. was diagnosed with sickle cell disease and reactive airway disease, which would be considered asthma after the age of one. He experienced a series of ear infections, upper respiratory infections, and a sickle cell pain crisis which required emergency room visits or treatment at several hospitals, including visits to Nemours Hospital for Children in November 2015 for vomiting over a three-day period and an upper respiratory infection, to Christiana Care Health System in January 2016 for a possible sickle cell pain crisis, and to the University of Maryland

3

Baltimore Washington Medical Center in April 2016 for wheezing and coughing and an upper respiratory infection. Z.R. also had pneumonia on two occasions.

Z.R.'s pediatrician referred Z.R. to the WRNMMC Otolaryngology Clinic for an evaluation of the suitability of BMTT surgery to implant ear tubes in order to drain infected fluid from the middle ear and prevent future ear infections. On June 22, 2016, when Z.R. was nine months old, Dr. Brietzke evaluated Z.R. at WRNMMC. He noted that Z.R. had previously experienced two severe ear infections, one as recently as one month prior to the visit during which he had had "purulent ear drainage" and a fever of 103 degrees and which had been resolved with antibiotics. Trial Exhibit ("Ex.") 226 at USA_Reese 1081-82. Dr. Brietzke also noted that Z.R. had constant "rhinorrhea," or runny nose, and snoring or "noisy breathing" at night, but that there had been no known apneic episodes involving a cessation of breathing. *Id.* Dr. Brietzke's examination of Z.R's ears revealed "otitis media bilaterally" and "effusion," or fluid in both ears, that Z.R. was breathing through his mouth, and that he was audibly wheezing. *Id.* at USA_Reese 1082-83. Dr. Brietzke was aware that Z.R. had sickle cell disease and reactive airway disease that would likely become asthma. Dr. Brietzke recommended that Z.R. receive a BMTT procedure to address the recurrent ear infections, as well as an adenoidectomy, or removal of the adenoid glands in the back of the mouth, to address the reported snoring and mouth-breathing issues. *Id.* at USA_Reese 1083. Dr. Brietzke considered both of these procedures to be elective in that they were medically optional. If Z.R.'s parents opted against the surgery, the conditions could still have been treated with medication. Based on Dr. Brietzke's recommendation, Z.R.'s recurring ear infections, and the fact that Z.R.'s older brother had previously undergone a BMTT procedure without issue, Z.R.'s parents decided to proceed with the surgery.

4

The surgery was scheduled for Tuesday, September 13, 2016, shortly after Z.R.'s first birthday and after his September 2, 2016 one-year medical checkup. As of that examination, Z.R.'s sickle cell disease and reactive airway disease were stable, and Z.R. was experiencing neurologically normal development.

## II.     Pre-Surgical Procedures

### A.     Pre-Surgical Discussions

On Thursday, September 8, 2016, the week before Z.R.'s surgery, Dr. Brietzke reviewed Z.R.'s case as part of a planning meeting with surgical staff and residents for the following week's procedures. Dr. Brietzke and a resident called Z.R.'s hematologist, Dr. Kip Hartman, and asked for input on how the surgical team could best manage the risks of surgery in light of Z.R.'s sickle cell disease. Dr. Hartman recommended that Z.R. be admitted to the hospital following surgery but did not advise that Z.R. required admission before the surgery. Based on Dr. Hartman's recommendation, and because Dr. Brietzke considered Z.R. to be a complex patient due to his sickle cell disease, Dr. Brietzke scheduled Z.R. to be admitted for further treatment and observation following the surgery.

The day before the surgery, on Monday, September 12, 2016, Dr. Gerbstadt and Dr. Willett learned that they had been assigned to serve as the anesthesiologists for Z.R.'s surgery. After reviewing Z.R.'s medical records and noting his sickle cell disease and reactive airway disease, Dr. Gerbstadt expressed concern to other pediatric anesthesiologists at WRNMMC about the difficulty and risk of the case, and she even asked two of her colleagues to perform the procedure in her place, but they declined. Dr. Gerbstadt also voiced concerns about the surgery to her supervisor, pediatric anesthesiologist and WRNMMC Chief of Anesthesiology Services Dr. Kyle Berry, who told her that since she was assigned to Z.R.'s case, she was to complete it. Based on

5

her review, Dr. Gerbstadt believed that Z.R. was at high risk for multiple complications from the anesthesia, including brain injury and death, based on his sickle cell disease, history of pneumonia and wheezing, and prior hospital visits, and she ultimately classified Z.R. as a high-risk patient classified at American Society of Anesthesiologists level three ("ASA III")—a category reserved for patients with a severe systemic disease. Dr. Gerbstadt spoke with the pediatric clinic that had referred Z.R. for surgery about his condition and recommended that Z.R. be pre-admitted to the hospital the night before his surgery to receive hydration through an intravenous line ("IV"), but the pediatric clinic continued to recommend only that Z.R. be admitted to the pediatric ward after the surgery.

Dr. Gerbstadt also discussed Z.R.'s case and sickle cell disease with Dr. Willett. Dr. Willett reviewed Z.R.'s medical records and research materials on sickle cell disease in preparation for the surgery. Together, they discussed the importance of controlling Z.R.'s breathing and vital signs while he was under anesthesia to avoid complications due to sickle cell disease, and they planned to have albuterol, a drug used to control asthma or reactive airway disease, ready during the surgery.

At 7:00 a.m. on September 13, 2016, the entire surgical team, including Dr. Brietzke, Dr. Townes, Dr. Gerbstadt, and Dr. Willett, convened for TeamSTEPPS—a pre-surgery meeting conducted to review all of the day's cases, including Z.R.'s surgery, which was scheduled to be the second case of the day. The discussion about Z.R.'s case was significant and prolonged, during which Dr. Gerbstadt expressed to Dr. Brietzke that Z.R. was a high-risk case for serious injury or death from a surgery requiring general anesthesia in light of Z.R.'s sickle cell disease and reactive airway disease, particularly because he had not been admitted the day before to have an IV and hydration in advance of surgery. She stated that ventilation—maintaining breathing—would be

6

problematic in light of his sickle cell disease, and that her opinion was that the surgery should be delayed if possible. In response, Dr. Brietzke took the position that the surgery needed to be done because it would help address Z.R.'s frequent ear infections and breathing issues, such that the benefits outweighed the risks. When Dr. Gerbstadt stated that the procedure would be high risk and should not be performed unless it was non-elective, Dr. Brietzke told her that it was not an elective case. Ultimately, Dr. Gerbstadt relented and agreed that the surgery could proceed if Z.R. was found to be "optimized" in that he was as healthy as he was going to be at the time of surgery. Accordingly, Dr. Brietzke and Dr. Gerbstadt agreed to reconvene after conducting a pre-operative examination of Z.R.

### B.     Consent to Surgery

On the morning of the surgery, Z.R. and his parents arrived at WRNMMC later than they had planned to arrive due to traffic. At the time of Z.R.'s surgery, the informed consent process at WRNMMC was split into two parts: a surgical consent led by the surgeons, focused on the risks of the surgical procedure itself, followed by an anesthesia consent focused on the risks of anesthesia that was conducted by the anesthesiology team. At approximately 8:00 a.m., Dr. Brietzke and Dr. Townes met with Sgt. Reese and gave a rote description of the risks of the BMTT and adenoidectomy surgeries using language on a standard form that Dr. Brietzke had developed and used for all such surgeries. The listed risks included pain, bleeding, infection, and potential damage to the structure of the ears, mouth, and throat and addressed anesthesia only by noting generally that there were "risks of anesthesia." Ex. 230. Neither Dr. Brietzke nor Dr. Townes told Z.R.'s parents that Z.R. was at heightened risk for injury or death from complications arising from anesthesia as a result of his sickle cell disease and reactive airway disease. The surgical consent form states that the procedure would "be performed by or under the direction of Dr. Brietzke." *Id.*

7

Ms. Harris-Reese and Sgt. Reese both believed that Dr. Brietzke would perform the surgery. Neither Dr. Brietzke nor Dr. Townes informed Plaintiffs that Dr. Townes, a resident, would be performing the surgery under Dr. Brietzke's supervision.

As for the consent to anesthesia, while Sgt. Reese was holding Z.R., Dr. Willett reviewed with Z.R.'s parents a standard form containing a long list of general risks of anesthesia that would be common to any patient, which included "[b]rain damage" and "[d]eath" but did not reference any heightened risk for patients with sickle cell disease or reactive airway disease.  Ex. 231. Because they had arrived late, Ms. Harris-Reese did not read the consent form and instead relied on Dr. Willett's oral description of the risks.  Dr. Willett did not inform Z.R.'s parents that Z.R. was classified as an ASA III patient or was at heightened risk of injury or death due to Z.R.'s preexisting conditions.  Both parents signed the anesthesia consent form at 8:11 a.m.

After Dr. Willett discussed the anesthesia consent form with Z.R.'s parents, Dr. Gerbstadt had a conversation with Ms. Harris-Reese while Sgt. Reese was nearby watching Z.R.  At this point, Dr. Gerbstadt reviewed Z.R.'s medical history and stated that in light of his sickle cell disease, reactive airway disease and wheezing, and recurrent infections, Z.R. was at a high risk for the various complications from anesthesia.

C.    **Pre-Surgical Examination**

During her consent discussion, Dr. Gerbstadt conducted an examination of Z.R., including checking his lungs.  She determined that he had no fever, wheezing, or pneumonia at that time and was therefore "optimized" and at "baseline," meaning that Z.R. was as healthy as he could be at that time, given his sickle cell disease, reactive airway disease, and other medical issues. Following the examination, Dr. Gerbstadt once again voiced her concerns to Dr. Brietzke in the pre-operative holding area.  Dr. Gerbstadt again informed Dr. Brietzke that Z.R. was a very high-

8

risk patient and expressed concern about moving forward with the procedure, to which Dr. Brietzke responded by acknowledging that he had heard her concerns, but he took no action to postpone or cancel the surgery.

## III. The Surgery

At approximately 8:19 a.m., Z.R. was taken into the operating room by Ms. Harris-Reese, who stayed with her son until Dr. Willett administered the anesthesia by mask induction. Dr. Willett then tried unsuccessfully to place an IV on Z.R. After several attempts by other members of the surgical team and significant difficulty, the IV was started at approximately 8:48 a.m. At 8:51 a.m., the anesthesia team inserted an endotracheal ("ET") tube and positioned Z.R. for surgery.

At 9:00 a.m., Dr. Townes began the BMTT procedure with Dr. Brietzke observing beside him. The BMTT was delayed by the presence of significant amounts of wax and thick mucoid secretions in both of Z.R.'s ears, which had to be removed by suction, by the anesthesia team's difficulty controlling Z.R.'s breathing, and by Dr. Townes's inexperience. Ultimately, the BMTT was completed at approximately 9:37 a.m., as recorded on the surgical case card by the circulating nurse, at which time Z.R. was prepared for the adenoidectomy.

From the time that Z.R. was intubated with the ET tube until the completion of the adenoidectomy at 9:45 a.m., his end-tidal carbon dioxide ("etCO2") level—which measures the amount of carbon dioxide released at the end of an exhaled breath—was abnormally high, ranging from 55 to 70 millimeters of mercury ("mmHg"), a measure of pressure signifying that Z.R. was poorly ventilated in that he was having trouble breathing properly, likely due to bronchospasms, which occur when the lung airways spasm and contract, making it difficult to breathe. A normal etCO2 level would have been between 35 and 45 mmHg, and an etCO2 reading above 50 mmHg

9

would have triggered an audible and visible alarm in the operating room. Shortly after intubation, Dr. Gerbstadt and Dr. Willett attempted to control Z.R.'s ventilation by administering albuterol, which is used to treat bronchospasms or wheezing in patients with asthma. At 9:16 a.m. and again at 9:36 a.m., they administered of 15 micrograms of fentanyl through the IV in order to deepen the level of anesthetic, which in turn was supposed to relax Z.R. and improve his breathing. None of these measures brought Z.R.'s etCO2 levels down to acceptable levels at any point during the surgery.

During this same time frame, Z.R.'s heart rate was abnormally high as his body sought to increase the flow of oxygen to the rest of his body to compensate for his breathing difficulties. The normal heart rate range for a child of Z.R.'s age was between 80 and 130 beats per minute ("BPM"), and alarms would go off if Z.R.'s heart rate fell below 75 BPM or exceeded 160 BPM. From 9:00 a.m. to 9:44 a.m., Z.R's heart rate remained at or above 136 BPM, exceeded 160 BPM at 9:18 a.m., and reached 170 BPM at 9:23 a.m. It remained at or above 153 BPM util 9:40 a.m., at which point it began to decline markedly. At 9:50 a.m., Z.R.'s heart rate had dropped to 68 BPM, at which point Z.R.'s heart had begun to fail.

Meanwhile, following the administration of fentanyl at 9:16 a.m., Z.R. began to experience low blood pressure. A systolic blood pressure—the pressure exerted against artery walls when the heart beats—of between 70 and 100 mmHg is considered normal for a patient like Z.R., and a systolic pressure below 70 mmHg would cause alarms to sound. A diastolic pressure—the pressure exerted against artery walls while the heart is resting between beats—between 40 and 55 mmHg would likewise be considered normal, with alarms sounding when diastolic pressure fell below 40 mmHg or rose above 70 mmHg. A mean blood pressure level below 50 mmHg was considered abnormally low and would cause alarms to sound in the operating room. The operating

room's blood pressure monitoring system was set to provide readings every five minutes, and Z.R.'s blood pressure reading was 84 (systolic) over 33 (diastolic), with a mean of 49 mmHg ("84/33 (mean 49)") at 9:23 a.m., 63/38 (mean 46) mmHg at 9:28 a.m., and 58/35 (mean 42) mmHg at 9:33 a.m. According to Dr. Hammer, the Government's anesthesiology expert, the reading at 9:28 a.m. was a red flag. Despite the low blood pressure readings, Dr. Gerbstadt and Dr. Willett did not change the settings on the monitoring system to receive blood pressure readings more frequently than once every five minutes.

When faced with the low blood pressure readings, Dr. Gerbstadt and Dr. Willett did not administer epinephrine or a similar drug, which likely would have both raised Z.R.'s blood pressure and addressed his difficulty breathing, until 9:47 a.m. Instead, they administered saline at 9:25 a.m. and at 9:31 a.m. in failed attempts to raise Z.R.'s blood pressure.

In the meantime, to address Z.R.'s problems breathing, Dr. Gerbstadt and Dr. Willett jointly discussed and ultimately decided to administer magnesium sulfate, a drug which acts as a smooth muscle relaxant and can be used to treat poor ventilation in asthmatic patients, but which also causes lower blood pressure, or hypotension. According to WRNMMC's pediatric emergency drug sheet, a copy of which was in the operating room, the proper dose of magnesium sulfate for a child of Z.R.'s age was 25 milligrams per kilogram of weight, or in Z.R.'s case 310 milligrams, to be administered over the course of 10-20 minutes. Instead, at 9:34 a.m., Dr. Gerbstadt administered 450 milligrams of magnesium sulfate as a single dose via IV. In the absence of epinephrine or a similar drug to counteract the hypotensive effects of the large dose of magnesium sulfate, Z.R.'s blood pressure continued to decline as a result of the magnesium sulfate and remained dangerously low for the duration of surgery, with the last reading before the end of the adenoidectomy recorded as 48/35 (mean 41) mmHg at 9:43 a.m.

11

Up to this point, Z.R.'s persistently poor ventilation, elevated heart rate, and low blood pressure had triggered multiple audible and visible alarms warning everyone in the operating room of these conditions.  In addition, Dr. Gerbstadt was orally describing the actions she was taking to address these issues, and, as acknowledged by Dr. Townes, the surgeons were aware that the anesthesiologists were having problems ventilating Z.R.  Despite these known problems, Dr. Brietzke allowed Dr. Townes to continue to perform the BMTT until its completion at approximately 9:37 a.m.  At that point, after a brief pause to take steps to transition from the BMTT to the adenoidectomy, Dr. Townes began the adenoidectomy.  That procedure was performed using electrocautery, a process that allowed the surgical team to remove the adenoid tissue while simultaneously cauterizing the area to control bleeding.  Accordingly, as explained by Dr. Myer at trial, the adenoidectomy could have been stopped at any point without a risk of significant bleeding.

During the course of the adenoidectomy, Z.R.'s heart rate, which had been abnormally elevated, began to decline markedly, from 154 BPM at 9:37 a.m. to 117 BPM at 9:46 a.m.  The additional stimulation caused by the adenoidectomy procedure caused increased stress on Z.R.'s heart.  Moreover, as Dr. Greeley testified at trial, in light of Z.R.'s continually poor ventilation and the need for his heart to beat faster to address this issue, Z.R.'s heart was beginning to fail, which resulted in the decreasing blood pressure and decreasing heart rate.  At approximately 9:45 a.m., as the adenoidectomy was close to completion, Dr. Gerbstadt, who had by this time concluded that the surgery could no longer proceed safely,  asked Dr. Townes if he was done, and as he completed the last remaining steps, told him, "you need to finish up right now because we're—he's not looking good," and "you need to stop." Gerbstadt Dep. at 105.

After Dr. Townes removed the surgical equipment from Z.R.'s mouth and stepped away, Dr. Gerbstadt and Dr. Willett provided 10 micrograms of epinephrine by IV at 9:47 a.m., but when they attempted to provide a dose of atropine to further treat Z.R.'s falling heart rate, Z.R.'s IV was "infiltrated," in that it became dislodged so that the medication would not go into his vein. At that point, Dr. Willett called for an intraosseous device ("IO"), which was inserted by Dr. Brietzke and Nurse Gutierrez and consisted of a catheter placed into Z.R.'s bone marrow to allow for the administration medication without an IV. As of 9:50 a.m., Z.R.'s heart rate had dropped to 68 beats per minute. An additional dose of epinephrine was given through the ET tube.

At approximately 10:00 a.m., Z.R.'s heart stopped beating and he entered cardiac arrest. From 10:00 a.m. to 10:11 a.m., the surgical team used a defibrillator, performed CPR, and administered epinephrine and atropine via the IO device in their efforts to restore Z.R.'s pulse. Z.R.'s heart was restarted at 10:11 a.m., by which time he had been without blood flow to his brain for approximately 11 minutes. Following the return of circulation, Z.R. was stabilized and transported to the Pediatric Intensive Care Unit ("PICU") for further evaluation and treatment.

In making these factual findings regarding the conduct of the surgery, the Court does not credit the testimony regarding the surgery timeline that cannot be squared with the documentary evidence. Specifically, the Court does not credit the opinions of Dr. Hammer and Dr. Kazahaya that the BMTT procedure took less time than was recorded on the surgical case card and other records, which establish that the BMTT began at 9:00 a.m. and ended at 9:37 a.m., and that the adenoidectomy began at 9:37 a.m. and ended at 9:45 a.m. *See* Ex. 236. The Court also does not credit the testimony that Dr. Gerbstadt administered epinephrine prior to the 9:34 a.m. administration of magnesium sulfate, and that Dr. Gerbstadt and Dr. Willett administered magnesium sulfate via an infusion over the course of several minutes, which is contradicted by the

13

surgical record as explained by Dr. Greeley, which lacks a solid line reflecting that the magnesium sulfate was infused over time. *See* Ex. 2 at 3; Ex. 237 at USA_Reese 41.

## IV.     Standards of Care

Based on the testimony of the expert anesthesiologists, Dr. Greeley and Dr. Hammer, and the expert ENTS, Dr. Myer and Dr. Kazahaya, the Court finds the following standards of care were applicable to Z.R.'s surgery.

### A.     Anesthesiologists

As to the anesthesiologists, Dr. Gerbstadt and Dr. Willett, the testimony of Dr. Greeley established several applicable standards of care. First, the anesthesiologists were required to manage Z.R.'s breathing and cardiopulmonary (heart and lung) stability during the operation and, when faced with  signs of poor ventilation, heart rate, and blood pressure, to respond by appropriately administering medication and properly monitoring Z.R.'s vital signs. In particular, where both Dr. Greeley and Dr. Hammer are in agreement, the standard of care required the administration of epinephrine or a similar drug in response to Z.R.'s drop in blood pressure at 9:28 a.m., and it further required that in light of Z.R.'s low blood pressure, magnesium sulfate should not have been provided to Z.R. rapidly without administering an additional drug to raise Z.R.'s blood pressure. To the extent that magnesium sulfate was provided, the standard of care required it to be infused slowly over the course of 10-20 minutes in a dosage consistent with the guidelines on the WRNMMC pediatric emergency drug sheet and not as a single dose "bolus." *See* Ex. 234. Relatedly, where Dr. Greeley testified that the standard of care, upon receiving abnormally low blood pressure readings, requires anesthesiologists to adjust the monitoring system to provide such readings more often than every five minutes, and Dr. Hammer agreed that most practitioners would have done so, the standard of care required the anesthesia team to change the settings on the

14

monitoring equipment following Z.R.'s dangerously low reading at 9:28 a.m. to check blood pressure more frequently than once every five minutes.

Second, as Dr. Greeley testified, the standard of care required the anesthesiologists, when unable to achieve stable ventilation and vital signs, to stop or suspend the surgery prior to the cardiac arrest in order to gain control of Z.R.'s ventilation and other vital signs. Although Dr. Greeley asserted that a prudent anesthesiologist would not have allowed the BMTT procedure to begin at 9:00 a.m. because of the high etCO2 readings, at a minimum the standard of care required an anesthesiologist of similar skill and experience as Dr. Gerbstadt to stop or suspend the surgery for the purpose of ensuring adequate anesthetic care after the completion of the BMTT at 9:37 a.m., at which point Z.R.'s etCO2 had been too high for 44 minutes and remained too high, his heart rate likewise had been elevated for 32 minutes and remained too high, and his blood pressure was dangerously low. Notably, Dr. Hammer acknowledged that it would have been reasonable for the anesthesiologists to stop the surgery at 9:28 a.m. in light of the low blood pressure readings. Accordingly, the Court finds that the standard of care required the attending anesthesiologist to stop or suspend the procedure prior to the cardiac arrest in response to Z.R.'s deteriorating condition and the failure to adequately control Z.R.'s ventilation.

**B.     ENTs**

As for the standards of care applicable to the ENTs, the Court received the expert testimony of Plaintiffs' expert witness, Dr. Myer, and the Government's expert witness, Dr. Kazahaya. Based on their testimony, the Court finds that in the case of a one-year-old patient, the ENTs needed to be aware of the heightened risks faced by Z.R. due to his sickle cell disease and reactive airway disease and that the standard of care required the ENTs to perform the surgery as quickly as possible to minimize those risks. As Dr. Myer testified, for a patient with Z.R.'s medical issues,

the surgery must be performed in no more than 25 minutes in total, with an end time of 9:25 a.m. An ENT resident such as Dr. Townes should have completed the BMTT part of the surgery within 10 to 15 minutes. Even Dr. Kazahaya agreed that the combined BMTT and adenoidectomy surgery should have been completed in less than 40 minutes. According to Dr. Myer, the standard of care required an attending ENT such as Dr. Brietzke, when aware that the patient had the kind of medical issues that Z.R. had and having received warnings by the anesthesiologist of serious concerns about the patient's suitability for surgery, to intervene and take over for the resident when the BMTT extended beyond the first 15 minutes. Finally, as Dr. Myer testified, the standard of care required an ENT surgeon, upon hearing alarms sound in the operating room signaling that the patient had abnormal vital signs or was otherwise in trouble, to make inquiry of the anesthesiologists and, if warranted by the information received, to stop the procedure. Indeed, Dr. Kazahaya acknowledged that when anesthesiologists make it known to the ENT surgeon that they are having trouble ventilating the patient, the standard of care requires the ENT to respond and determine if the surgery needs to be stopped or suspended.

## C.    Informed Consent

As to the duty of informed consent, as Dr. Greeley testified, the standard of care required that physicians disclose the fact that a patient is at high risk from a procedure and the nature of that higher risk. In a case in which the patient is at a heightened risk for serious injury damage or death from the use of anesthesia as a result of underlying health conditions, such as sickle cell disease and reactive airway disease, the standard of care required the physicians to specifically disclose those risks to the patient or his parents during the informed consent process, not simply to rely on the general warnings in standard forms stating that anesthesia can result in serious injury or death.

16

## V.    Post-Surgical Condition and Care

### A.    Z.R.'s Injuries

After Z.R. was stabilized and moved to the WRNMMC PICU, he was diagnosed, based in part on the results of magnetic resonance imaging ("MRI"), as having "suffered cardiac arrest with resultant hypoxic brain injury." Ex. 2 at USA_Reese 9264-65. Where Plaintiffs' expert neurologist, Dr. Nelson, testified at trial that prior to the surgery, Z.R. was a relatively healthy child and was developing normally, and that his brain injury was caused by the cardiac arrest and the loss of a heartbeat for 11 minutes, the Court finds that Z.R.'s injuries were caused by the cardiac arrest that occurred during his surgery on September 13, 2016. Indeed, even with his preexisting medical conditions and emergency room visits, none of Z.R.'s doctors had expressed concerns about his development prior to the events of September 13, 2016. Z.R. was able to walk, climb stairs, feed himself, play with his siblings, speak simple words, and interact with his surroundings. Following surgery, Z.R. can no longer do any of those things.

It is beyond dispute that as a result of the cardiac arrest, Z.R. now suffers from a permanent global neurological impairment giving rise to a host of disabilities. Although he is still capable of responding to visual and auditory input, Z.R. is now largely nonverbal, immobile, and confined to a wheelchair or his bed. Z.R. now takes 32 different medications related to his injuries, breathes with the aid of a ventilator through a tracheostomy tube implanted into a hole in the middle of his neck, and must be fed through a gastrostomy tube ("G-tube") surgically inserted into his stomach to provide nutrients in place of solid food. Z.R. also experiences multiple seizures per day, each of which carries a risk of death, and has been hospitalized for seizures on multiple occasions. As testified to by Dr. Nelson, Z.R. is able to experience pain, including as a result of being attached to a ventilator and other activities that typify Z.R.'s daily routine.

17

As Dr. Nelson testified, based on evaluations of Z.R. and MRI data, Z.R.'s brain injury will prevent him from ever being able to live independently, graduate from high school, or be gainfully employed, and Z.R. will require 24-hour nursing care and assisted daily living for the rest of his life. The Government's expert neurologist, Dr. Katz, likewise agreed that Z.R. requires 24-hour care as a result of his injuries. These injuries are permanent, and the disparity between life's demands and Z.R's abilities will only increase as he grows older. Z.R. would have obtained at least a high school diploma absent his injury and would have had an earning capacity at least equal to that of the average male high school graduate, but his disabilities now prevent him from completing high school and achieving any earning capacity for the remainder of his life. Z.R. will also continue to experience significant pain and suffering because of his cardiac arrest and resulting brain injury.

As to life expectancy, it is undisputed that Z.R. will face reduced longevity as a result of his brain injury. The relevant expert witnesses gave opinions on life expectancy that were approximately five years apart, and both revised their opinions upward at trial. The Court credits Dr. Nelson's original estimate that Z.R. is expected to live up to 20 years from the date of the surgery, which is approximately 15 years from the date of Dr. Nelson's trial testimony. The Court thus finds a life expectancy of age 21, which is until September 2036.

**B.    Medical Care Needs**

Throughout the rest of his life, Z.R. will require extensive medical care as a result of the injuries he sustained during his surgery. His medical care expenses fall into three main categories: nursing care; therapy; and other medical needs, including medications, medical devices, assisted living renovations, and various prior expenses which resulted in an outstanding Maryland Medicaid lien.

18

### 1.   Nursing Care

Consistent with the testimony of both Dr. Nelson and Dr. Katz, it is undisputed that as a result of Z.R.'s injuries, he requires nursing care 24 hours per day.  Because of absences, however, Z.R.'s current nursing service agency actually provides only an average of approximately 12 hours of coverage per day, and when the nurses do show up, they are often poorly trained and ill-equipped to meet Z.R.'s complex medical needs.  This nursing service agency provides to Z.R. a registered nurse ("RN") approximately 30 percent of the time and a Licensed Practical Nurse ("LPN") approximately 70 percent of the time.  RNs can develop and change a plan of care, delegate appropriate tasks to LPNs, and conduct assessments of patient care to ensure that service is being provided that adequately meets the patient's needs.  *See* Md. Code Regs. 10.27.09 (West 2022) (Standards of Practice for Registered Nurses).  In contrast, LPNs cannot develop or change a plan of care, receive less training than RNs, and often must be supervised by an RN in the performance of their duties.  *See* Md. Code Regs. 10.27.10 (Standards of Practice for Licensed Practical Nurses).  On multiple occasions, LPNs have fallen asleep on the job or required training and guidance by Ms. Harris-Reese in order to perform adequately their duties.  The inexperience of Z.R.'s current nursing staff has even put his life in danger, with one nurse's failure to clean secretions from Z.R.'s tracheostomy tube resulting in a trip to the hospital to prevent Z.R. from suffocating from an inability to breathe.  Thus, the overall level of nursing care that Z.R. has received to date has not been adequate to meet his needs.  In contrast, the RNs assigned to care for Z.R. have typically been more able to meet Z.R.'s complex medical needs.  The Court therefore credits Dr. Nelson's expert opinion that in light of the complex nature of Z.R.'s medical needs, including his frequent seizures, substantial RN care is necessary in order to adequately care for Z.R. and supervise the provision of care by LPNs.

As testified to by Dr. Davis, going forward, the safest approach to fulfilling Z.R.'s nursing needs remains for Z.R. to obtain nursing care through an agency to ensure round-the-clock coverage. Because an RN is necessary to develop and decide whether to change a plan of care, such agencies, including the one currently used by Z.R.'s family, typically provide a mix of RN and LPN care and have RNs generally supervising and monitoring the work of LPNs, though not on site. Though LPNs can provide adequate care under such arrangements, in light of the actual experience involving the nursing care provided to Z.R., the Court finds that while LPNs can be part of Z.R.'s nursing care, Z.R. will require a higher proportion of RN care than he is currently receiving in order to ensure that his ongoing medical needs are adequately met.

### 2.   Other Medical Expenses

In addition to skilled nursing services, Z.R. will require various medications, medical devices, and forms of therapy to adequately treat and manage his injuries. Z.R. is currently taking 32 different medications to treat conditions associated with his injuries traceable to the surgery, as listed in charts prepared by Dr. Davis. *See* Ex. 17-1 at 8-9. Z.R. is and will be fully dependent for the rest of his life on certain assistive daily living devices, including a ventilator, feeding pump, wheelchair, specialized bed, and mechanical lift. Some of this equipment will necessitate renovations to Z.R.'s home in order to make it fully accessible to his wheelchair and lifts, or that Z.R.'s family move to a residence that meets these needs. As Dr. Nelson testified, and Dr. Katz did not dispute, Z.R. will require additional medical devices to be surgically implanted into his body to adequately treat and manage Z.R.'s disabilities going forward, including a Baclofen Pump, which delivers medication directly into Z.R.'s spinal cord, and a Vagus Nerve Stimulator, which sends regular electrical signals to his brain to reduce the frequency of potentially life-threatening seizures.

Z.R. is currently approved to receive physical therapy, occupational therapy, speech therapy, and related assistive technology, though his treatments have been interrupted by the ongoing COVID-19 pandemic, and Z.R. is currently on a wait list to receive his prescribed therapies in the future. The Court credits Dr. Nelson's testimony that these therapies are medically necessary to, and have the potential to, maintain and gradually improve Z.R.'s motor and cognitive function. The Court also credits Dr. Nelson's testimony that the previously incurred expenses that resulted in a Maryland Medicaid lien on any settlement or judgment from this action in the amount of $27,127.61 were medically necessary and fair and reasonable in terms of cost when compared to the community standard for the cost of similar services.

## C.    Parental Care

In addition to the care provided by his nurses, Z.R. also regularly receives care from his parents, Ms. Harris-Reese and Sgt. Reese, particularly when nurses do not show up for work or cannot provide adequate care. For example, on the morning of the first day of trial in this case, Sgt. Reese was unable to attend the trial because the nursing agency notified Ms. Harris-Reese that it would be unable to provide Z.R.'s nursing service for the day. When the nursing service is not available or is inadequate to meet Z.R.'s needs, Ms. Harris-Reese serves as Z.R.'s primary medical caretaker. Ms. Harris-Reese previously studied nursing at Delaware State University and was formerly certified as a Certified Nursing Assistant ("CNA"). As estimated by Dr. Davis, Ms. Harris-Reese routinely provides an average of 22 hours per week of care at a level equivalent to that of a nurse, including administering medication, instructing inexperienced nurses, and suctioning and cleaning Z.R's G-tube and tracheostomy tube. Because of the inadequate skilled nursing support and the need for her to provide care to Z.R., Ms. Harris-Reese has been unable to accept full-time employment or complete her college degree. As testified to by Dr. Davis, based

on a comparison to the work of RNs and LPNs, Ms. Harris-Reese's past care of Z.R. is fairly valued at a rate of between $43.75 and $80.00 per hour.

To date, the cost of Z.R.'s medical care has been paid by TRICARE, the federal government health insurance program for active-duty or retired military members like Sgt. Reese and their families. Plaintiffs do not seek to recover those past medical expenses covered by TRICARE. Due to the strain that Z.R.'s injury and related parental responsibilities has put on Sgt. Reese's military career, which has caused him to have to forgo multiple assignments, Sgt. Reese plans to leave the Army at the end of his enlistment period, in April 2023, in order to take a more active role in caring for Z.R. Because Sgt. Reese will not be eligible for military retirement at that point, he will no longer be eligible to received TRICARE coverage for himself and his family.

## VI.   Dr. Gerbstadt's Employment Status

A key issue in this case is whether Dr. Gerbstadt was a federal employee for purposes of the Federal Tort Claims Act. As to this issue, the Court makes the following factual findings.

Dr. Christine Gerbstadt worked as an anesthesiologist at WRNMMC from June 2013 to August 2017. Prior to July 2013, Dr. Gerbstadt worked pursuant to a contract between the Government and SAR Corporation. Beginning on July 29, 2013, Dr. Gerbstadt worked pursuant to a contract between the Government and Donald L. Mooney Enterprises, LLC ("Mooney"). Under this contract ("the Mooney Contract"), which became effective on March 13, 2012, Mooney was required to provide physicians like Dr. Gerbstadt and other health care providers to perform various medical services at WRNMMC. The Mooney Contract contemplated that Mooney could retain health care providers under either "personal services" or "non-personal services" contracts. Ex. 200 ¶ C.3.3.1, USA_Reese 20422. Personal services contractors were to be "subject to day-to-day supervision and control by [WRNMMC] health care facility personnel" so as to "create an

employer-employee relationship" between the Government and the health care provider "only to the extent necessary for providing the health care services under the contract." Ex. 200 ¶ C.3.3.1.1, USA_Reese 20422.  For personal services contractors, the Government agreed to treat a complaint of negligence within the scope of the performance of the contract "in the same manner" as a negligence claim against a health care provider employed by the federal government.  *Id.*  In contrast, for non-personal services contractors, the Mooney Contract provided that WRNMMC had "no control over professional aspects of the services rendered, including, by example, the Contractor's professional medical judgment, diagnosis, or specific medical treatments," *id.* ¶ 52.237-7, USA_Reese 20487, and that "the Government will not be liable for malpractice allegations against contract [health care providers] based upon performance of this contract." *Id.* ¶ C.3.3.1.2, USA_Reese 20422.  Under the Mooney Contract, Mooney was required "to carry malpractice insurance for its contract [health care providers]." *Id.*

Task Order 15 to the Mooney Contract required Mooney to provide physicians to fill the "non-personal services" position of "Anesthesiologist – General." Ex. 201 at Mooney 151.  An anesthesiologist filling this position was required to work "full time" for a total of 2,150 hours per year. *Id.*  Under the Performance Work Statement ("PWS") for the position, the anesthesiologist was required to "work under the general professional direction of the Chief of Anesthesiology Services" of WRNMMC. *Id.* at Mooney 156.  The Mooney Contract further provided that a contract health care provider "shall not introduce new procedures or services without prior approval of the Department Chief or representative," who is the "deciding authority" in the event of any "disagreements or deviations from protocols or procedures."  Ex. 200 ¶ C.3.15.7, USA_Reese 20431.  However, the Mooney Contract also provided that Mooney was "responsible for the current competence of [health care providers] which provide health care services under this

contract," Ex. 200 ¶ C.3.15.2, USA_Reese 20430-31, and was required to have a "planned and systematic quality control process and Quality Control Plan" and to "ensure that all contract [health care providers] comply with [WRNMMC's] quality management/process improvement activities as well as [Joint Commission] performance elements." Ex. 200 ¶¶ C.4.1, C.4.2. As stated in an employee handbook, Mooney committed to evaluate the work performance of all of its employees working under the Mooney Contract.

To fill one of the positions required by Task Order 15, Mooney contacted Dr. Gerbstadt, who had been working at WRNMMC under the contract with SAR Corporation, and entered into an "Independent Contracting Services" agreement between Nurses Etc. Staffing ("NES") ("the NES Subcontract"), an entity controlled by Mooney, and The Anesthesia Experts, Inc., a S-corporation established by Dr. Gerbstadt in 2009 to allow her to work as a contract health care provider at hospitals like WRNMMC. *See* Ex. 212. Under the NES Subcontract, Dr. Gerbstadt was paid an annual salary of $449,280, which was based on a rate of $234 per hour, and received "no benefits such as unemployment insurance, health insurance or workers compensation insurance," was "responsible for payment of all federal, state and local income taxes," and was responsible "for providing all tools and materials required for performance of the tasks agreed to." Ex. 212. Neither the Mooney Contract nor the NES Subcontract forbade Dr. Gerbstadt from seeing patients outside of her full-time work at WRNMMC. Although Mooney initially provided Dr. Gerbstadt with malpractice insurance, Dr. Gerbstadt was later informed it was provided in error because she was not a Mooney employee, so she purchased her own malpractice insurance policy through Medical Mutual, which was in effect from January 16, 2016 to November 2, 2017.

While working under the Mooney Contract and the NES Subcontract, Dr. Gerbstadt's duties consisted primarily of providing anesthesia services in the operating room as part of an

24

integrated team of government physicians and contract health care providers.  She also taught and supervised residents, including in the operating room, and on rare occasions worked in the WRNMMC pre-admission clinic and on the obstetric and labor/delivery deck.  Dr. Gerbstadt performed all of her work on site at WRNMMC, and all of the equipment, supplies, medication, and support staff upon which Gerbstadt relied to perform her duties were provided by WRNMMC.

Dr. Gerbstadt was required to work 40 hours per week, consisting of four ten-hour shifts and was expected to be on call one weekend a month.  She provided anesthesia services for operations based on a weekly schedule established by staff reporting to WRNMMC's Chief of Anesthesiology Services, Dr. Berry.  Although she could request vacation or other leave, such requests were subject to approval or denial by Dr. Berry or his staff and were not always approved. Dr. Gerbstadt had no ability to refuse a patient or an assignment, and she had no ability to bring outside patients in to WRNMMC.  While she was working at WRNMMC, Dr. Gerbstadt had no outside medical practice and did not see patients other than those to whom she was assigned by WRNMMC.  In order to receive and maintain credentials and privileges to treat patients at WRNMMC, Dr. Gerbstadt had to undergo WRNMMC's professional performance evaluation process, which consisted of several months of direct monitoring of her work as an anesthesiologist, a process that is repeated periodically, in a manner consistent with the requirements of the Joint Commission accreditation service.

Dr. Gerbstadt worked under the supervision of Dr. Berry.  At the time of the surgery, WRNMMC had approximately 40 staff anesthesiologists, 20 of whom were active-duty military or government personnel and 20 of whom were contractors.  As Dr. Berry testified, there was no material difference between WRNMMC's treatment of Dr. Gerbstadt and its treatment of anesthesiologists who were government employees.   Government and contractor staff

25

anesthesiologists were interchangeable in that there were no types of assignments reserved for one category or the other. Dr. Gerbstadt was never identified to patients, by uniform or otherwise, as an independent contractor rather than a government physician. She was required to attend meetings of the Anesthesiology Department. Like the government anesthesiologists, she was also required to adhere to the Anesthesia Department Manual ("the Manual"), written by Dr. Berry, which contained guidelines and requirements for performing anesthesia services at WRNMMC. According to Dr. Berry, he monitored compliance with the requirements of the Manual, and if Dr. Gerbstadt or any other anesthesiologist at WRNMMC were to deviate from those requirements, there would be an evaluation to determine whether it had been clinically necessary to deviate from the protocols, followed by corrective counseling for the physician if necessary. If an anesthesiologist such as Dr. Gerbstadt failed to follow a particular administrative requirement of the Manual more than once, Dr. Berry would talk to that physician.

Regarding Z.R.'s surgery, although Dr. Gerbstadt raised concerns about whether the surgery should proceed in light of Z.R.'s medical conditions that placed him at high risk from general anesthesia, when Dr. Brietzke did not agree and decided to conduct the surgery despite her reservations, she did not feel comfortable refusing to perform the anesthesia services out of a concern that she might lose her job, in part because Dr. Brietzke was a senior military officer who outranked her supervisor, Dr. Berry, who had himself directed her to continue with the assignment.

After the surgery, Dr. Berry decided to relieve Dr. Gerbstadt and Dr. Willett from having to staff additional operations that day, and he met with Dr. Gerbstadt to inform her that she could take the rest of the day to off in order to recover from the experience and to discuss the events of the surgery in order to determine what had happened. Neither Dr. Berry nor any other representative of the Government contacted Mooney regarding Dr. Gerbstadt's role in the

26

operation or to alert it to a possible claim of negligence against Dr. Gerbstadt. Rather, in late 2016, Lois Loveridge, a Government paralegal, contacted Dr. Gerbstadt and told her that she would be represented by the Government on any claim relating to the Z.R. surgery.

In August 2017, Dr. Gerbstadt became a federal employee at the National Institutes of Health. Accordingly, on November 3, 2017, she canceled her personal medical malpractice insurance, effective that day. Because that policy was a "claims made" policy, it would only cover a claim relating to Z.R.'s surgery if the policy was in effect on the date that the Z.R. filed his complaint or lawsuit, unless Dr. Gerbstadt purchased a "tail" to the policy, or an extension of the coverage period to insure against all future claims based on past occurrences. Ex. 219. Dr. Gerbstadt declined to purchase the "tail" despite her awareness of the possibility that a claim might be filed relating to Z.R.'s surgery based on her understanding, from her discussions with Loveridge, that she would be covered and defended by the Government on any such claim.

When an administrative claim was filed on behalf of Z.R. in September 2018, Dr. Gerbstadt was again contacted by Loveridge and Cynthia Brancato, an attorney for WRNMMC, and asked to provide them with details about Z.R.'s surgery as if she were a government employee. Even when the Complaint in this case was filed on July 3, 2019, the Government did not inform Mooney about the administrative claim until July 2020, one year later.

## CONCLUSIONS OF LAW

In this action, Plaintiffs argue that the United States is liable under the FTCA for the permanent injuries sustained by Z.R. because they were caused by the negligent acts of the anesthesiologists and ENTs who participated in the surgery, and at that time those physicians were employed by the United States and acting within the scope of their employment. The two claims advanced by Plaintiffs at trial are for (1) medical negligence; and (2) failure to obtain informed consent.

27

Under the FTCA, the United States is liable for "the negligent and wrongful act or omission of any employee of [a federal] agency while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 2672.

## I.    Dr. Gerbstadt

As a threshold issue, the Government contests whether Dr. Gerbstadt was an employee of a federal agency at the time of the surgery, as required for FTCA liability. Specifically, the Government argues that Dr. Gerbstadt was working at WRNMMC as an independent contractor, as reflected in the Mooney Contract and the NES Subcontract. Plaintiffs and Mooney do not dispute that the terms of the Mooney Contract state that Dr. Gerbstadt had a "non-personal services" relationship with the Government, and that the NES Subcontract designated her to be an "Independent Contractor." Ex. 200 at 6; Ex. 212. Instead, Plaintiffs and Mooney argue that the evidence at trial established that the administration of these contracts created an employer-employee relationship in practice that subjects the Government to FTCA liability for any medical negligence by Dr. Gerbstadt.

### A.    Legal Standards

Absent a statutory waiver, the United States is shielded by sovereign immunity from suit for a civil tort. *See Kerns v. United States*, 585 F.3d 187, 193-94 (4th Cir. 2009). The FTCA contains a limited waiver of sovereign immunity, allowing a plaintiff to sue the United States for monetary damages in compensation for injuries resulting from certain torts by "any employee of the Government" acting within the scope of employment. 28 U.S.C. § 1346(b). Such employees include "officers or employees of any federal agency, members of the military or naval forces of the United States, . . . and persons acting on behalf of a federal agency in an official capacity,

temporarily or permanently in the service of the United States, whether with or without compensation." *Id.* § 2671. The term "federal agency" explicitly excludes "any contractor with the United States." *Id.* Therefore, Congress has not waived the sovereign immunity of the United States for injuries resulting from the actions of independent contractors performing work for the Government. *See United States v. Orleans*, 425 U.S. 807, 814 (1976). "The FTCA, as a waiver of sovereign immunity, is strictly construed, and all ambiguities are resolved in favor of the sovereign." *Robb v. United States*, 80 F.3d 884, 887 (4th Cir. 1996). "Accordingly, the independent contractor exception to the waiver of sovereign immunity has been construed broadly." *Id.* Although state law governs the substantive duties of the United States under the FTCA, the determination of whether an individual is an independent contractor or an employee of the Government is a question of federal law. *Id.; see also Logue v. United States*, 412 U.S. 521, 528 (1973); *Berkman v. United States*, 957 F.2d 108, 112 (4th Cir. 1992).

In *Logue* and *Orleans*, the United States Supreme Court established a "control" test for the distinction between an employee and an independent contractor where the relationship is fixed by contract, holding that the distinction "turn[s] on the absence of authority in the principal to control the physical conduct of the contractor in performance of the contract." *Logue*, 412 U.S. at 527 (citing the Restatement (Second) of Agency § 2 (1958)). In assessing whether contract personnel should be classified as employees for purposes of FTCA liability under the control test, a "critical element" is the "power of the Federal Government 'to control the detailed physical performance of the contractor.'" *Orleans* 425 U.S. at 814 (quoting *Logue* 412 U.S. at 527-28). "Only where the Government has the power under the contract to supervise a contractor's day-to-day operations and to control the detailed physical performance of the contractor can it be said that the contractor is an employee or agent of the United States within the [FTCA]." *Wood v. Standard Prods. Co.*,

671 F.2d 825, 829 (4th Cir. 1982).  The fact that the contractor is required to adhere to certain federal government rules and regulations does not necessarily establish that the government is exercising such control.   In *Logue*, where a county had a contract to house federal detainees in a county jail, the Court ruled that even though the county was required to follow federal rules for the care and custody of federal prisoners, the jail employees were not federal employees under the FTCA because the contract did not give the federal government authority to physically supervise the conduct of the jail's employees.  *Id.* at 529-30; *see also Orleans* 425 U.S. at 817-18 (finding that requirements that a community action agency receiving federal funding must follow "extensive regulations," including "employment policies and procedures, lobbying limitations, [and] accounting and inspection procedures," did not render contractors federal employees under the FTCA).

In assessing whether such control exists, consideration of "the contract and its terms in fixing the relationship" is "critical."  *Wood*, 671 F.2d at 829.  It is not, however, dispositive.  Even if the contract explicitly states that an individual is an independent contractor, the course of conduct could still establish that the requisite control exists to the point that there is an employer-employee relationship.  *See id.* at 829-30 (considering multiple additional factors beyond the contract itself); *Robb*, 80 F.3d at 892 (considering both the terms of the contract and the course of conduct relating to the specific practices of hiring doctors).

Courts have provided additional guidance on the more specific determination of whether a private physician providing medical services at a federal government facility is properly classified as an independent contractor or an employee.  The United States Court of Appeals for the Fourth Circuit has held that in such circumstances, the "control" test focuses primarily on whether the government exercises "control over the primary activity contracted for and not the peripheral,

administrative acts relating to such activity." *Wood*, 671 F.2d at 832. For physicians, the primary activity for which the issue of control is to be evaluated is "the performance of the medical services." *Robb*, 80 F.3d at 888-89. In considering this question, however, it is not the case "that a physician must always be deemed an independent contractor simply because of the necessity that a physician exercise independent professional judgment in providing medical treatment to his or her patients." *Id.* at 889. At the same time, the fact that a physician is typically required to adhere to general rules and guidelines of a government hospital or other medical facility does not necessarily establish that the physician is subject to the control or supervision of the federal government. *See Wood*, 671 F.2d at 831-32. Because doctors necessarily must maintain direct control over their own medical decisions, "it is less productive to debate the control over the discharge of professional services in the medical context," so courts should therefore also consider other indicia of control such as the degree of control over "when a doctor performs his services, the number of hours he performs them, and the administrative details incident" to those services. *Cf. Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 260 (4th Cir. 1997) (discussing the analysis for determining whether a contractor physician should be deemed an employee for purposes of a discrimination claim under Title VII of the Civil Rights Act of 1964).

In applying the control test to a physician, the Fourth Circuit has focused on whether the terms of the contract provide for governmental control over the physician's medical services but has also considered various other factors about the work arrangement as set forth in the contract and as established by the course of conduct. *See Wood*, 671 F.2d at 829-30; *Robb*, 80 F.3d at 892. In *Wood*, the court concluded that a physician who provided care at his own private clinic to seamen eligible for medical care from the United States Public Health Service ("PHS") was an independent contractor based on the facts that the contract with the PHS referred to the physician

31

as a "contract physician"; the contract provided no directions or limitations on the provision of care other than that the physician was to provide only outpatient care "in the same manner and of the same high quality" as provided to the physician's private patients; the contract gave the government no control over the prescription of drugs, provision of medical supplies, or referral of patients for hospitalization and tests other than that prescriptions and referrals should be to a PHS-approved pharmacy or a PHS hospital; and review of his work was limited to an annual visit to review the adequacy of his medical facilities, not a review of day-to-day operations. *Id.* at 829-30. The court also considered that the contract did not require the physician to maintain any set office hours; it required the physician to provide his own office space, support staff, supplies, and equipment; the doctor was paid by billing the PHS under a fee schedule set forth in the contract; the physician had the right to refuse to treat patients; and the treatment of patients under the contract was only a minor part of the physician's work, which was largely a private practice. *Wood*, 671 F.2d at 830 & n.10.

In *Robb*, the court held that a doctor who worked at a standalone primary care clinic located within an Air Force hospital but operated by a private company under contract with the Air Force was an independent contractor. *Id.* at 891. Although the contract authorized the Air Force to "review past and current performance of" and "determine qualifications of" the doctor, the court concluded that this provision did not establish governmental control of the medical care but was instead "a standard quality assurance clause" to allow the government to determine whether it was satisfied with a contractor's performance. *Id.* at 892. The court also considered that even while the contract gave the government the ability to select doctors, in practice the contractor company selected, hired, and paid all of the doctors pursuant to contractually agreed upon rates. *Id.* at 892. The court found that the doctor was an independent contractor even though certain administrative

provisions were consistent with an employer-employee relationship, including that the government provided the facilities, equipment, and supplies used by the doctors, it provided administrative support, and the contract physicians were required to use government resources for specialty consultations and other services. *See Robb*, 80 F.3d at 893. *Robb* also found that a second physician working at the Air Force base under a similar contractual arrangement was an independent contractor, where the contract between the government and the physician's contract company explicitly stated that the physicians would work as an independent contractor and that the company had to maintain liability insurance, and the only element of control over the medical work was a provision allowing the Air Force to evaluate the "quality of professional and administrative services rendered," including "the professional judgments, diagnos[e]s, or specific medical treatments," even while the Air Force provided a radiology facility, office space, and some but not all of the necessary equipment, supplies, and support personnel. *Id.* at 893-94. The court considered the clause allowing for evaluation of the services provided to be another "quality assurance clause" consistent with contractor status and noted that the radiologist only rarely used the Air Force's radiology facility for film reading. *Id.*

### B.    Dr. Gerbstadt's Status

Applying these principles to the evidence at trial, the Court agrees with the Government that the terms of the contract generally favor the conclusion that WRNMMC did not exercise control over Dr. Gerbstadt's work as a staff anesthesiologist. The relevant task order referred to Dr. Gerbstadt's role of a staff anesthesiologist as a nonpersonal services position, and under the Mooney Contract, the Government would not be liable for any claims of malpractice by such an anesthesiologist. The Mooney Contract also incorporated Federal Acquisition Regulation ("FAR") § 52.237-7(a), which states that while the federal agency "may evaluate the quality of

33

professional and administrative services provided," it "retains no control over professional aspects of the services rendered, including by example, the Contractor's professional medical judgment, diagnosis, or specific medical treatments." Ex. 200 at USA_Reese 20487. The Mooney Contract and the NES Subcontract provided that Dr. Gerbstadt was to be paid by Mooney, and that Mooney was required to have a "planned and systematic quality control process and Quality Control Plan" and to "ensure that all contract [health care providers] comply with [WRNMMC's] quality management/process improvement activities," Ex. 200 ¶¶ C.4.1, C.4.2, and was "responsible for the current competence of [health care providers] which provide health care services under this contract." Ex. 200 ¶ C.3.15.2, USA_Reese 20430-31. Under the Mooney Contract, Dr. Gerbstadt also had the right, if she chose, to engage in medical practice outside of WRNMMC, and the Government disclaimed responsibility for maintaining malpractice insurance. The NES Subcontract provided that Dr. Gerbstadt would be responsible for payment of all income taxes, and that she would not receive health insurance, workers' compensation insurance, or other benefits.

The Mooney Contract, however, does not uniformly support the conclusion that the Government lacked control over Dr. Gerbstadt's work. Section 2(a) of the Performance Work Statement to Task Order 15 specifically states that Dr. Gerbstadt was required to "[w]ork under the general professional direction of the Chief of Anesthesiology Services," evidencing that a WRNMMC official had a right to control her daily performance that is at odds with the lack of supervision typical in an independent contractor relationship. Ex. 201 at Mooney 156. The Mooney Contract also provided that Dr. Gerbstadt "shall not introduce new procedures or services without prior approval of the Department Chief or representative," and that the Department Chief is the "deciding authority" on such issues. Ex. 200 ¶ C.3.15.7, USA_Reese 20431. *See Cilecek,*

34

115 F.3d at 260 ("An employer controls the work and its instrumentalities and circumstances to a greater degree than does a hiring party in an independent contractor relationship.") Accordingly, the Mooney Contract provided the Government with the right to subject Dr. Gerbstadt to a greater degree of control and supervision than any of the physicians in *Wood* or *Robb*.

Beyond the contract language, the evidence on the actual administration of the contract reveals that the Government, in practice, had an even more significant degree of control over Dr. Gerbstadt's work, including her provision of medical services. Dr. Gerbstadt testified that Dr. Berry was her supervisor, and Dr. Berry testified that he had the same level of supervision and control over Dr. Gerbstadt and other contract anesthesiologists, including over the provision of clinical services, as he had over the anesthesiologists formally employed by the federal government. Although the NES Employee Handbook called for Mooney to conduct regular performance evaluations of its contract health care providers, see Ex. 217 at Mooney 273, in reality it was WRNMMC, not Mooney, that conducted such evaluations, and it did the same performance evaluations for both government and contractor anesthesiologists alike. Further, Dr. Berry confirmed that like all anesthesiologists at WRNMMC, Dr. Gerbstadt was required to adhere not only to general hospital regulations, such as those providing procedures for "Code Blue" emergency resuscitation and for the use of alarms during surgery, but also to the provisions of the WRNMMC Anesthesia Department Manual authored by Dr. Berry, Ex. 225, which provided specific requirements and guidelines relating to the provision of anesthesia services. The Manual included requirements that an anesthesiologist perform a pre-anesthesia evaluation "within 30 days" and have it "updated within 48 hours of the procedure," *id.* at USA_Reese 12419, that a staff anesthesiologist provide "[p]ersonal participation in the most demanding procedures in this plan," and that an anesthesiologist "engaged in medical direction should not personally be administering

another anesthetic." *Id.* at USA_Reese 12429, 12431. Significantly, the Manual required staff anesthesiologists to "[s]upport and adhere to the chain of command," *id.* at USA_Reese 12430, and directed the Chief of Anesthesiology to engage in "[c]ontinuing surveillance of the professional performance of all individuals who have delineated clinical privileges in the anesthesia service." *Id.* at USA_Reese 12426-27. As Dr. Berry testified, if necessary, he would talk to anesthesiologists to address failures to adhere to the terms of the Manual. Where these requirements were specific to the practice area in which Dr. Gerbstadt worked and were subject to direct enforcement by her identified supervisor, the requirements of the Manual were not merely general hospital rules and regulations that all physicians with hospital privileges were required to follow as a matter of maintaining professional standards. *Cf. Cilecek*, 115 F.3d at 262 (concluding that general requirements to follow hospital rules and regulations did not render a contractor a federal employee for purposes of Title VII). This evidence demonstrates that WRNMMC's ability to control Dr. Gerbstadt's provision of medical services went well beyond the degree of control present in *Wood*, which consisted of only an annual review of the adequacy of the contractor physician's medical clinic, 671 F.2d at 830, and in *Robb*, which was limited to quality assurance provisions that generally allowed the Air Force to review the qualifications and performance of physicians operating under the contract, 80 F.3d at 892.

Moreover, the evidence established that WRNMMC exercised the same degree of control and supervision over both government and contractor anesthesiologists in relation to other aspects of their work, particularly their assignments and work schedule. Dr. Berry or his designee scheduled all anesthesiology assignments without regard to contractor status, and if Dr. Gerbstadt wanted to change an assignment or take leave, such a change had to be approved by the Anesthesiology Department and would be approved only if sufficient coverage was available.

Where Dr. Gerbstadt was required to work 40 hours per week for WRNMMC and be on call one weekend a month, Dr. Gerbstadt had no separate medical practice and had no practical ability to have one. In these ways, the Government had a higher degree of control over Dr. Gerbstadt than was present in *Cilecek*, in which the court found the physician at issue to be a contractor based in part on the fact that he proposed the number of hours he would work in any given month and the timing of his shifts, such that he could choose to work a different number of hours in a given month and thus had the freedom to do other work as part of his own medical practice and with other unaffiliated health care facilities. *See Cilecek*, 115 F.3d at 261-62.

A substantial number of the additional factors considered in *Wood* and *Robb* also support the conclusion that Dr. Gerbstadt was operating as an employee of WRNMMC. Dr. Gerbstadt performed all of her duties onsite at a government hospital, did not work out of a freestanding clinic within the hospital, was not identified to patients as an independent contractor, and worked directly alongside government physicians in a manner that was indistinguishable from that of a federal employee. *Cf. Robb*, 80 F.3d at 893 (considering as a contractor a physician who operated a "stand-alone" primary care clinic located within an Air Force hospital); *Wood*, 671 F.2d at 829 (considering as a contractor a physician who provided care at his own private clinic). WRNMMC provided virtually all of the equipment needed to perform her medical services and provided all of the support staff. WRNMMC made all patient assignments and did not permit Dr. Gerbstadt to refuse any patients. In all of these ways, Dr. Gerbstadt was again subject to the same degree of control and supervision as the government anesthesiologists.

Finally, following the surgery at issue here, WRNMMC treated Dr. Gerbstadt as an employee in that she was directly contacted by or on behalf of Government attorneys, told that the Government would represent her as to any claims, and instructed to cooperate in their inquiries

about the Z.R. surgery in anticipation of litigation.  Notably, the Government did not notify

Mooney about the adverse outcome of the surgery in September 2016, upon the filing of an

administrative claim in September 2018, or even upon the filing of the present case on July 3, 2019

until Mooney was served with a third-party complaint in this action on July 24, 2020.  Thus, where

the intention of the parties is a consideration in determining whether a physician is an employee

for FTCA purposes, see *Robb*, 80 F.3d at 893, the course of conduct evidences WRNMMC's

intention to treat Dr. Gerbstadt as an employee with respect to the specific incident at issue in this

case.

In the end, while the relevant contracts identify Dr. Gerbstadt as an independent contractor,

"[i]f the parties want the benefits of an independent contractor relationship, they have to actually

have one." *See Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 661 (4th Cir. 2019) (citing *Robb*,

80 F.3d at 893 n.11).  Here, the evidence shows that the Government had the authority to supervise

Dr. Gerbstadt's day-to-day activities and control the "detailed physical performance" of the

contractor.  *Logue*, 412 U.S. at 527-28; *Wood*, 671 F.2d at 829.  Task Order 15 to the Mooney

Contract explicitly required Dr. Gerbstadt to "[w]ork under the general professional direction of

the Chief of Anesthesiology Services."  Ex. 201 at Mooney 156.  She was required to adhere the

chain of command and to the specific clinical practices of the Anesthesia Department Manual as

enforced by Dr. Berry, who was required to engage in "continuing surveillance of the professional

performance of all individuals who have delineated clinical privileges in the anesthesia service,"

including Dr. Gerbstadt.  Ex. 225 at USA_Reese 12426-27.  All of her work occurred onsite at a

federal government hospital in a manner indistinguishable from that of a federal employee, where

WRNMMC determined her specific daily work schedule, assigned all of her patients, provided her

with support staff and equipment, and treated her like an employee during its own inquiry into

Z.R.'s surgery. Most importantly, unlike in any of the cases cited by the Government, as Dr. Berry testified at trial, Dr. Gerbstadt was subjected to the same degree of control and supervision as the government anesthesiologists at WRNMMC, who by definition were subject to day-to-day control by the federal government. Notably, under the Mooney Contract, a personal services contract—which creates an employer-employee relationship—is defined by the fact that the contractor is "subject to day-to-day supervision and control by health care facility personnel comparable to that exercised over military and civil service [health care providers] engaged in comparable health care services." Ex. 200 ¶ C.3.3.1.1, USA_Reese 20422. Accordingly, the Court finds by a preponderance of the evidence presented at trial that the Mooney Contract and its administration created an employer-employee relationship in practice, and that this relationship subjects the Government to liability under the FTCA for any medical negligence by Dr. Gerbstadt.

## II.    Medical Negligence

The FTCA authorizes claims for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Because the allegedly negligent acts in this case occurred at WRNMMC in Bethesda, Maryland, Maryland law governs Plaintiffs' claims. In Maryland, to recover for injuries caused by medical malpractice, a plaintiff must prove by a preponderance of the evidence: (1) the applicable standard of care; (2) that this standard has been breached; and (3) a causal relationship between the violation and the injury. *See, e.g., Weimer v. Hetrick*, 525 A.2d 643, 651 (Md. 1987); *Ford v. United States*, 165 F. Supp. 3d 400, 423 (D. Md. 2016) (applying these elements in an FTCA case). If the Court finds that Z.R.'s injury was the result of medical

negligence, then all negligent members of the surgical team will be jointly and severally liable for the entire damages amount "regardless of whether the conduct of one directly caused more or less injury compared to that of another, because they acted together with a common purpose resulting in responsibility for the common injury." *Mercy Medical Ctr. v. Julian*, 56 A.3d 147, 150 (Md. 2012).

## A.   Breaches of Standards of Care

Physicians owe a duty "to use that degree of care and skill which is expected of a reasonably competent practitioner in the same class to which [the physician] belongs, acting in the same or similar circumstances," taking into account training and experience, as well as "advances in the profession, availability of facilities, specialization or general practice, proximity of specialists and special facilities, together with all other relevant considerations." *Shilkret v. Annapolis Emergency Hosp.*, 349 A.2d 245, 253 (Md. 1975). Under Maryland law, the adequacy of a physician's treatment is evaluated against a national standard of care, *id.* at 251, and "the defendant's use of suitable professional skill is generally a topic calling for expert testimony." *Johns Hopkins Hosp. v. Genda*, 258 A.2d 595, 599 (Md. 1969). As discussed above in the Findings of Fact, there were multiple standards of care at issue during Z.R.'s surgery. As set forth below, both anesthesiologists and an ENT breached these standards of care.

### 1.   Anesthesiologists

The evidence establishes that there were breaches of the standards of care applicable to the anesthesiologists. As noted by Dr. Greeley, after Z.R.'s etCO2 rate and heart rate had remained above acceptable levels throughout the surgery beginning at 9:00 a.m., Z.R.'s blood pressure became unacceptably low at 9:28 a.m., yet the anesthesiologists failed to administer epinephrine or a similar drug in response. Then, while Z.R.'s blood pressure remained low, they administered

40

a large dose of magnesium sulfate rapidly at 9:34 a.m. without also administering an additional drug to raise Z.R.'s blood pressure to a safe level. The dosage of 450 mg and rapid rate of administration was inconsistent with WRNMMC's pediatric drug sheet, which was available to the anesthesiologists in the operating room and called for only 310 mg to be given via infusion over the course of 10-20 minutes for a child of Z.R.'s age and weight. These failures breached the standard of care.

The fact that the anesthesiologists took other steps to try to address Z.R.'s ventilation problems, elevated heart rate, and low blood pressure does not excuse the breach of the standard of care. Although the evidence shows that the anesthesiologists administered albuterol and fentanyl between 9:00 a.m. and 9:36 a.m., saline in an effort to raise blood pressure at 9:25 a.m. and 9:31 a.m., and epinephrine at 9:47 a.m., Dr. Willett acknowledged, and the anesthesia record confirms, that they were never able to control adequately Z.R. breathing, heart rate, and blood pressure. Notably, Dr. Gerbstadt and Dr. Willett jointly discussed the idea of administering epinephrine at 9:28 a.m. but rejected it. As Dr. Greeley stated, by the time they administered epinephrine at 9:47 a.m., the dose of epinephrine was both too late and too small. Thus, the fact that the anesthesiologists took steps aimed at improving Z.R.'s breathing and heart rate do not excuse the breach of the standard of care relating to the administration of medication to Z.R.

As the attending anesthesiologist, Dr. Gerbstadt also breached the standard of care by failing to stop or suspend the surgery at any point prior to its completion in response to Z.R.'s deteriorating condition. As discussed above, Dr. Gerbstadt was aware that Z.R. was a high-risk patient because of his sickle cell disease and reactive airway disease, which resulted in his classification as ASA III. As Dr. Greeley and Dr. Willett testified, from the very beginning and throughout the surgery, the anesthesiologists were never able to stabilize his breathing, as

41

evidenced by the fact that his etCO2 was at unacceptably high levels at almost all times. In turn, Z.R.'s heart rate remained at unacceptably high levels, and at 9:28 a.m. his blood pressure dropped to unacceptably low levels. Yet Dr. Gerbstadt did not take affirmative steps to stop the surgery, or at least to suspend it while the anesthesiologists attempted other means of stabilizing Z.R. even though, as the attending anesthesiologist, she had the authority to do so. Notably, Dr. Greeley, Dr. Myer, and Dr. Kazahaya all testified that the surgery could have been stopped at any time without risk to Z.R. In particular, Dr. Gerbstadt could have stopped the surgery before the adenoidectomy began at 9:37 a.m., and because the adenoidectomy was performed with a cauterizer, Dr. Myer and Dr. Kazahaya both testified that the surgery could have been safely halted at any time during that procedure. The fact that Dr. Gerbstadt did not take steps to do so until she told Dr. Townes at approximately 9:45 a.m., when the surgery was already effectively over, that he "need[ed] to finish up right now," was a breach of the standard of care which required such a stoppage to have occurred earlier. Gerbstadt Dep. at 105.

Although the parties generally agree that Dr. Gerbstadt breached the standard of care, they disagree on whether Dr. Willett, a resident physician who had completed a one-year internship following medical school, which constituted the first year of his residency, and had been a licensed physician for two years at the time of the surgery, also breached the standard of care. State and federal courts in Maryland have not directly ruled on the specific standard of care applicable to resident physicians, relative to the standard for a specialist who has completed residency training. Although Dr. Hammer testified that he personally would never assign any blame to a resident unless the resident acted intentionally to harm the patient, this position is not reflected in the law. Under Maryland law, the conduct of professionals who have special training and expertise like doctors should be "measured against the standard of a hypothetical reasonable person with similar

training and expertise." *Armacost v. Davis*, 200 A.3d 859, 872 (Md. 2019). The United States Court of Appeals for the Seventh Circuit has stated that the "majority rule" is that residents who have completed their first year of residency and thus can be licensed physicians should be subject "to the same standard of care as physicians who have completed their residency in the same field of medicine" and thus found a second-year resident negligent for failing to diagnose an infection that caused a patient's death. *Arpin v. United States*, 521 F.3d 769, 774-75 (7th Cir. 2008). Similarly, the United States Court of Appeals for the Fifth Circuit has held that a physician who was four months into his anesthesia residency was negligent for failing to call to the attending anesthesiologist's attention the danger of giving a second dose of epinephrine. *Ayers v. United States*, 750 F.2d 449, 455-57 (5th Cir. 1985).

Here, Dr. Willett was a fully licensed physician at the time of Z.R.'s surgery, with general medical experience consisting of a one-year post-graduate internship at WRNMMC from 2013 to 2014, followed by two years as a medical officer in Okinawa, Japan prior to the start of his anesthesiology residency. He had specialized anesthesia experience consisting of approximately 10 weeks of anesthesia rotations in medical school, followed by a one-month rotation in anesthesia during his internship, and he was midway through the third month of his anesthesia residency at the time of Z.R.'s surgery. By that point, he had previously provided anesthesia care to patients with the attending anesthesiologist outside the operating room but monitoring his treatment remotely, so he had some degree of experience taking the lead in providing anesthesia services and exercising independent medical judgment. As to Z.R.'s surgery, Dr. Willett and Dr. Gerbstadt worked as a team and jointly discussed treatment options throughout the procedure, and he was primarily responsible for managing the provision of anesthetic to Z.R. under the supervision of Dr. Gerbstadt.

Although Dr. Greeley testified that, in general, he would not delegate major decision-making to a resident and would expect a resident to follow the direction of the attending anesthesiologist during a surgery, he also stated that an attending anesthesiologist and a resident, both of whom are licensed physicians, are held to the same standard of care with respect to the monitoring of vital signs and administration of drugs including epinephrine, magnesium sulfate, and alternative medications for managing cardiopulmonary instability, which are "anesthesia 101"—basic anesthesiology skills expected of both attending anesthesiologists and residents like Dr. Willett.  Notably, Dr. Hammer acknowledged that a resident with Dr. Willett's level of experience would be expected to be able to monitor a patient's vital signs, both recognize and manage heart and lung instability during an operation, and to know the proper usage of medications such as epinephrine. Dr. Willett testified that he was familiar with the uses and side effects of both epinephrine and magnesium sulfate at the time of the surgery, and that he could have personally increased the frequency of blood pressure monitoring, characterizing such a measure as "not extremely difficulty to do" and "not infrequently done."  Willett Dep. at 123.  Dr. Willett was aware of, and had direct access to, the WRNMMC pediatric emergency drug sheet, which was in the operating room during the surgery and provided specific guidance on the correct dosage and means of delivery for any use of magnesium sulfate on a child of Z.R.'s age and weight.  Given Dr. Willett's level of training and experience at the time of Z.R.'s surgery, as well as the expert testimony establishing that a resident with similar training and experience would have been expected to properly monitor a patient's vital signs and manage heart and lung instability through the use of drugs including epinephrine, magnesium sulfate, and other alternatives, the Court concludes that Dr. Willett was both subject to, and breached, the standards of care requiring anesthesiologists to:  (1) ensure that epinephrine or a similar drug was administered response to

44

Z.R.'s drop in blood pressure at 9:28 a.m.; and (2) ensure that magnesium sulfate not be given at a dosage and rate in direct contravention of the WRNMMC pediatric emergency drug sheet, and to a patient with low blood pressure without first administering an additional drug to raise Z.R.'s blood pressure. The Court finds however, that Dr. Willett was not responsible for, and thus did not breach, the standard of care requiring the attending anesthesiologist to stop or suspend the surgery prior to the cardiac arrest in response to the failure to adequately control Z.R.'s ventilation and vital signs.

## 2. ENTs

The evidence established that Dr. Brietzke breached the standard of care for ENTs, as identified in the Findings of Fact, by allowing the full surgery to last 45 minutes, significantly more than the 25 minutes that would be within the standard of care for a patient with Z.R.'s high-risk conditions. Relatedly, he allowed the BMTT portion of Z.R.'s surgery to continue for up to 37 minutes without taking over from Dr. Townes, which he should have done after the first 15 minutes. The BMTT therefore lasted significantly longer than even Dr. Kazahaya's more generous limit of 25 minutes for a resident such as Dr. Townes to complete a BMTT. Thus, the failure either to intervene during the BMTT, or to end the surgery after the BMTT and before the adenoidectomy, was a breach of the standard of care because those failures caused the surgery to extend to an unreasonably lengthy time period. Dr. Brietzke also breached the standard of care by failing to inquire when both audible alarms and discussion in the operating made it clear that, as Dr. Townes testified, the anesthesiologists were having problems properly ventilating Z.R. and maintaining his vital signs at acceptable levels and were delivering various medications in an effort to do so.

45

Even if these steps may not have been necessary during a surgery on a patient without high-risk conditions, here, Dr. Brietzke was specifically aware that Z.R. had sickle cell disease and reactive airway disease and that based on those conditions and Z.R.'s recent history of hospital visits for pneumonia and ear and respiratory infections, and the failure to admit Z.R. to the hospital the night before in order to be properly hydrated, Dr. Gerbstadt had specifically expressed concerns to him that the surgery should be delayed and should not occur unless it was specifically necessary. Dr. Brietzke had nevertheless convinced Dr. Gerbstadt to accede to the surgery by discussing its necessity and having her examine Z.R. to determine that he was sufficiently optimized that morning. *See supra* Findings of Fact part II.A.  Where Dr. Brietzke was specifically aware of the high risk that a lengthy surgery posed to Z.R., and was aware that the anesthesiologists were having trouble maintaining his breathing and vital signs, he was aware that the surgery was proceeding too slowly and breached the standard of care by failing to take over from Dr. Townes during the BMTT to complete the overall surgery within the time permitted by the standard of care, or to stop the surgery before the adenoidectomy so that the overall time of the surgery would not be extended any further beyond that limit.

The Court does not find, however, that Dr. Townes breached the standard of care. Although as a resident he could still be liable for negligence if he did not meet the standard of care for a physician of similar training and experience, see *Armacost*, 200 A.3d at 872, he was not a party to the final pre-surgical conversation between Dr. Gerbstadt and Dr. Brietzke about whether the operation could proceed safely and therefore lacked equivalent notice of the high-risk nature of the surgery and Dr. Gerbstadt's concerns about whether the surgery should proceed at all.  The evidence also did not show that he had the option, as Dr. Brietzke did, to intervene in a way that would accelerate the completion of the surgery, or that he had the authority to stop the surgery

once it started. Accordingly, the Court concludes that Plaintiffs have not met their burden to establish that Dr. Townes breached the standard of care.

### B.    Causation

Having determined that standards of care were breached during Z.R.'s surgery, the Court must determine whether the breaches caused Z.R.'s permanent injuries. In a medical negligence action, the plaintiff bears the burden of proving by a preponderance of the evidence that a defendant's breach of the standard of care proximately caused the injury. *Weimer*, 525 A.2d at 651; *Ford*, 165 F. Supp. 3d at 424-25. In order to demonstrate proximate causation, "the plaintiff must prove the defendant's breach of duty was more likely than not (i.e., probably) the cause of injury." *Hurley v. United States*, 923 F.2d 1091, 1094 (4th Cir.1991). Under Maryland law, a plaintiff is required to prove only that the defendant's negligence was *a* proximate cause of the injury, rather than the sole cause. *See Stickley v. Chisholm*, 765 A.2d 662, 666-67 (Md. Ct. Spec. App. 2001).

Dr. Nelson, Plaintiffs' expert neurologist, and MRI results that he presented, established that Z.R.'s permanent brain injury was caused by a lack of blood and oxygen to the brain for a sustained period of time, which was in turn caused by the cardiac arrest that he suffered at the end of the surgery. Accordingly, causation is established for purposes of Plaintiffs' medical negligence claim if the physicians' breaches of the standards of care were proximate causes of Z.R.'s cardiac arrest.

As Dr. Greeley testified, ventilation, heart rate, and blood pressure are all linked in their relationship to cardiac arrest. Here, Z.R.'s inability to breathe and exchange oxygen due to poor ventilation under anesthesia resulted in an increased heart rate, as his heart responded to the lack of oxygen by beating faster to pump more blood throughout the body. Eventually, when his

ventilation and blood pressure did not improve, either through effective medical intervention or stopping the surgery, Z.R.'s heart began to give out and pump less effectively, resulting in a decreased heart rate which, without adequate intervention, reduced blood flow to the body's organs and caused the cardiac arrest.

As to the specific breaches of the standards of care, first, where even the Government anesthesiology expert Dr. Hammer agreed that Z.R.'s cardiac arrest likely would not have occurred had epinephrine been administered to raise Z.R.'s blood pressure at 9:28 a.m., it is effectively undisputed that the anesthesiologists' failure to administer epinephrine or a similar drug at 9:28 a.m. proximately caused Z.R.'s cardiac arrest and thus his anoxic brain injury. Second, as Dr. Greeley testified, the administration of magnesium sulfate, which is known to cause hypotension, at a time when Z.R. was already experiencing low blood pressure, foreseeably resulted in a continued decline in Z.R.'s blood pressure, as reflected by the blood pressure readings taken at 9:38 a.m. and 9:43 a.m. In turn, the low blood pressure further lowered Z.R.'s heart rate from 9:42 a.m. onward, leading to his subsequent cardiac arrest. Accordingly, where the administration of magnesium sulfate was a substantial factor causing Z.R.'s cardiac arrest, Plaintiffs have demonstrated by a preponderance of the evidence that this breach was a proximate cause of Z.R.'s injury. *See Stickley*, 765 A.2d at 666-67.

As for the failure by Dr. Gerbstadt and Dr. Brietzke to stop the surgery prior to the completion of the adenoidectomy, the surgery could have been stopped at any point in time, and Dr. Greeley testified that that if the surgery had been stopped before it began at 9:00 a.m. or even before the adenoidectomy began at 9:37 a.m., Z.R. would have avoided the further stimulation caused by the adenoidectomy that imposed additional stress on his heart. This stress, when combined with the ongoing poor ventilation, low heart rate, and low blood pressure, was a

reasonably foreseeable cause of the cardiac arrest. Accordingly, the Court concludes that Dr. Gerbstadt's failure to stop the surgery before the start of the adenoidectomy was a proximate cause of Z.R.'s cardiac arrest and resulting brain injury.

Relatedly, as Dr. Myer testified, and Dr. Kazahaya did not dispute, had the surgery been stopped or shortened such that it had ended by 9:35 a.m. or earlier, as would be appropriate under the standard of care for an attending ENT, Z.R. would not have experienced cardiac arrest and would have thereby avoided his subsequent anoxic brain injury. Therefore, the Court finds that Dr. Brietzke's failure to stop the surgery before the adenoidectomy, or to intervene during the BMTT to complete the surgery before that time, was a proximate cause of Z.R.'s permanent injuries.

Accordingly, the Court concludes that (1) the failure of the anesthesiologists to administer the proper medications when faced with signs of poor ventilation, heart rate, and blood pressure; (2) the failure by Dr. Gerbstadt or Dr. Brietzke to stop or suspend the surgery before its completion; and (3) the failure by Dr. Brietzke to take over for Dr. Townes in order to bring the surgery to completion on a faster timeline were all proximate causes of Z.R.'s brain injury.

### III.     Informed Consent

Plaintiffs also assert a breach of the duty of informed consent. Under Maryland law, the performance of a medical procedure without the informed consent of the patient is a separate, negligence-based cause of action. *Sard v. Hardy*, 379 A.2d 1014, 1020 (Md. 1977). "[T]he doctrine of informed consent imposes on a physician, before he subjects his patient to medical treatment, the duty to explain the procedure to the patient and to warn him of any material risks or dangers inherent in or collateral to the therapy, so as to enable the patient to make an intelligent and informed choice about whether or not to undergo such treatment." *Id.* This duty arises because

"unlike the physician, the patient is untrained in medical science, and therefore depends completely on the trust and skill of his physician for the information on which he makes his decision." *Id.* An informed consent claim is comprised of the following elements: (1) the duty to disclose to the patient material information that a physician knows or ought to know would be significant to a reasonable person in the patient's position in deciding whether or not to submit to a particular medical treatment or procedure; (2) a breach of that duty by failing to make an adequate disclosure; and (3) that the breach was the proximate cause of the patient's injuries. *See Shannon v. Fusco,* 89 A.3d 1156, 1169 (Md. 2014). A signed consent form is "simply one additional piece of evidence for the jury to consider in assessing the merits of" a lack of informed consent claim. *Sard,* 379 A.2d at 1019 n.3. Accordingly, the presence or absence of a signed consent form is not dispositive of the issue.

As stated in the Findings of Fact, the standard of care required Z.R.'s physicians to disclose not only the general risks of the BMTT and adenoidectomy procedures and of anesthesia, but also the unique, higher risks from anesthesia faced by Z.R. due to his preexisting sickle cell disease and reactive airway disease, which led to his designation as a pediatric ASA III patient. The physicians certainly should have known that a reasonable person in the position of Ms. Harris-Reese and Sgt. Reese would find such heightened risk to be significant in deciding whether to consent to the BMTT and adenoidectomy procedures, particularly when Dr. Brietzke had deemed both to be medically optional and was prepared to offer alternative treatments for Z.R.'s conditions. *See Sard,* 379 A.2d at 1019, 1023 (holding that a jury could reasonably find that a two percent risk of failure associated with a sterilization procedure was a material risk requiring disclosure). Indeed, Ms. Harris-Reese testified that had she been aware that Z.R. was at a high risk of serious injury or death from such a routine elective procedure, she would have withheld consent for the operation

and explored alternative treatment options. Likewise, Sgt. Reese testified that had he been told that Z.R. would be at high risk for serious injury or death, he would not have consented to the surgery and would instead have explored alternative procedures or waited until it would be safer to complete the surgery. The evidence therefore established a duty to disclose not only the general risks of the surgery and of anesthesia, but the specific, higher risks faced by Z.R. due to his sickle cell disease and reactive airway disease.

The trial evidence established that the ENTs, Dr. Brietzke and Dr. Townes, provided only a rote recitation of the general risks of the BMTT and adenoidectomy procedures, using a standard form that only generally referenced "risks of anesthesia" without specifying what they were. Ex. 230. Though at least Dr. Brietzke was aware of the high risk from anesthesia faced by Z.R. and of Dr. Gerbstadt's reservations about proceeding with the surgery, he did not disclose those facts to Z.R.'s parents. Similarly, Dr. Willett, who had Plaintiffs sign the anesthesia consent form, discussed only the general risks from anesthesia, which include brain damage and death, without discussing the higher risks faced by Z.R. *See* Exs. 230, 231; *supra* Findings of Fact part II.B. Thus, Dr. Brietzke, Dr. Townes, and Dr. Willett each failed to provide a sufficient disclosure of material risks.

Dr. Gerbstadt, however, had a follow-up consent discussion with Ms. Harris-Reese in which she discussed Z.R.'s medical conditions, including that he was at higher risk for complications from the anesthesia because of his sickle cell disease, reactive airway disease, and recurring infections. Dr. Willett generally corroborated this discussion. Although Sgt. Reese testified that he had not heard any references to brain injury or death, and Ms. Harris-Reese testified that she would not have allowed the surgery to proceed had she been told of such risks, Z.R.'s parents had very limited recall of the consent process, acknowledged that Ms. Harris-Reese

did not actually read the forms, and had varying recollections on whether and when Ms. Harris-Reese spoke to Dr. Gerbstadt and what was discussed. In light of the lack of precision of Plaintiffs' accounts of the consent process, which may have been the result of the fact that they arrived late to the hospital and were subject to WRNMMC's confusing multi-part consent process, Plaintiffs have not provided sufficient evidence to rebut the evidence that Dr. Gerbstadt disclosed Z.R.'s higher risk for complications from anesthesia and her own reservations about the surgery. Between the general disclosure in the anesthesia consent form by Dr. Willett that the anesthesia could result that in complications including brain injury and death, and Dr. Gerbstadt's additional disclosure of Z.R.'s higher risks for such complications, the Court finds that there was no breach of the duty to disclose material risks. Accordingly, the Court finds that Plaintiffs' informed consent claim fails.

## IV.   Damages

Maryland law controls the determination of the nature and measure of damages to be awarded. *See, e.g., Lawson v. United States*, 454 F. Supp. 2d 373, 417 (D. Md. 2006); *Burke v. United States*, 605 F. Supp. 981, 987–88 (D. Md. 1985) (citing *United States v. Muniz*, 374 U.S. 150, 153 (1963), and 28 U.S.C. § 1346(b) and § 2674). "Maryland law entitles a plaintiff to recover the reasonable value of all damages caused by a defendant's wrongful conduct." *Lawson*, 454 F. Supp. 2d at 417. Under Maryland law, a tortfeasor is responsible for any aggravation of a preexisting condition, even where that condition constitutes an injury or disability. *See, e.g., Harris v. Jones*, 380 A.2d 611, 616 n.2 (Md. 1977).

Plaintiffs claim damages for Z.R.'s lost earning capacity, future medical care costs, the value of Ms. Harris-Reese's past home nursing services, and for the value of a Maryland Medicaid lien, as well as noneconomic damages for Z.R.'s pain and suffering. As stated in the Findings of

52

Fact, both parties agree that Z.R. is permanently disabled, requires 24-hour nursing care, and faces reduced longevity as a result of his cardiac arrest and resultant brain injury. The Court has also found that Z.R.'s life expectancy is 20 years from the date of the surgery, to age 21, which is until September 2036. *See supra* Findings of Fact part V.A.

### A.    Lost Earnings

In Maryland, a plaintiff may recover damages for loss of earning capacity that may be reasonably expected in the future. *See Adams v. Benson*, 117 A.2d 881, 885 (Md. 1955). The calculation for lost income includes fringe benefits. *See Muenstermann v. United States*, 787 F. Supp. 499, 525 (D. Md. 1992). Based on the undisputed testimony of Dr. Nelson and Dr. Davis, the Court has found that Z.R. would have obtained at least a high school education absent his injury, and that his disabilities will now prevent him from achieving any residual earning capacity for the remainder of his life. Here, the parties relied on the same sources for estimating the number of years Z.R. would have worked absent his injury, factoring in his sickle cell disease, and reached similar conclusions in calculating Z.R.'s lost future earnings based on a high school education. In fact, the Government's expert economist, Chadwick Staller, calculated a higher floor for lost earnings of $1,923,762, as compared to the calculation of Plaintiffs' expert Dr. Thomas Borzilleri of $1,561,145.

Dr. Borzilleri calculated the net present value of Z.R.'s lost future earnings by using a "bond ladder" method under which he incorporated current yields on tax-free AAA-rated municipal bonds available for purchase today, such that the maturity date of each bond in Dr. Borzilleri's hypothetical portfolio matches the date at which the expected future loss will be incurred by Z.R., thereby reducing the need to forecast future interest rates based on historical data. This methodology was designed to provide a discount rate "based on the rate of interest that

would be earned on the 'best and safest investments,'" as required by *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 537 (1983) (quoting *Chesapeake & Ohio R. Co. v. Kelly*, 241 U.S. 485, 491 (1916)). "Once it is assumed that the injured worker would definitely have worked for a specific term of years, he is entitled to a risk-free stream of future income to replace his lost wages; therefore, the discount rate should not reflect the market's premium for investors who are willing to accept some risk of default." *Id*. Dr. Borzilleri's method would allow Z.R. to purchase each bond contained in Dr. Borzilleri's hypothetical portfolio today, hold it to its maturity date, and cash it to produce the amount needed on the date the loss is expected to occur, with no risk that he will be unable to obtain the return required to account for his loss. This Court finds that Dr. Borzilleri's bond ladder method satisfies the relevant standard. *See Jones & Laughlin Steel Corp*, 462 U.S. at 548 ("[S]ince specific forecasts of future price inflation remain too unreliable to be useful in many cases, it will normally be a costly and ultimately unproductive waste of [] resources to make such forecasts the centerpiece of litigation"). Therefore, the Court will award $1,561,145 in damages for Z.R.'s lost future earnings, in accordance with Dr. Borzilleri's calculations.

In its Trial Brief, the Government argues that under the FTCA, courts must deduct federal income taxes from any projected lost earnings in computing lost future earnings, citing *Flannery for Flannery v. United States*, 718 F.2d 108 (4th Cir. 1983), in which the Fourth Circuit held that in an FTCA case, even if the applicable state law bars deductions of federal income taxes from a damages award, such taxes must nevertheless be deducted from a plaintiff's future lost earnings on the grounds that a pre-income tax award would be "punitive" because it "gives the plaintiff more than is truly compensatory" and would thus run afoul of the FTCA's bar on punitive damages. *Id*. at 111; *see* 28 U.S.C. § 2674. However, as this Court as previously concluded, the Supreme Court effectively rejected this analysis in *Molzof v. United States*, 502 U.S. 301 (1992).

*See Desir v. United States*, No. TDC-17-3465, 2021 WL 766399, at *8 (D. Md. Feb. 26, 2021).

The Court therefore will not deduct federal income taxes from the award of future lost earnings.

*Cf. Lumber Terminals v. Nowakowski*, 373 A.2d 282, 291-92 (Md. Ct. Spec. App. 1977) (holding

that damages for loss of future earnings are to be based upon a plaintiff's gross earnings or earning

capacity and that income taxes should not be factored into the calculation).

### B.    Future Medical Expenses

Plaintiffs also seek damages for future medical expenses, which are recoverable under

Maryland law. *See Ford*, 165 F. Supp. 3d at 428 (citing *Lawson*, 454 F. Supp. 2d at 417).  Damages

for future medical expenses are recoverable if it is more likely than not that the expense will be

incurred.  *See id.*  "[I]t is the plaintiff's burden to prove damages with a reasonable amount of

certainty." *Id.* (quoting *Lewin Realty III, Inc. v. Brooks*, 771 A.2d 446, 476 (Md. Ct. Spec. App.

2001), *aff'd* 835 A.2d 616 (Md. 2003)).

### 1.    Z.R.'s Medical Needs

The primary form of future medical expenses sought by Plaintiffs is future nursing care

expenses, which will need to be provided 24 hours per day for the rest of Z.R.'s life.  At trial,

Plaintiffs' expert lifecare planner, Dr. Davis, concluded that contracting with a nursing agency

would be the best way to ensure adequate and reliable care for Z.R. and provided a cost estimate

of between $43.75 and $80.00 per hour as a reasonable rate for nursing services based on a random

sample of agencies located in Z.R.'s community, with the low end of that range approximating the

cost for LPN nursing services and the high end representing the cost for RN care.   The

Government's expert, Dr. Katz, agreed that Z.R. will require 24-hour care but proposed an hourly

rate of $40 based on an estimate of the average salary of an LPN, an estimated 25 percent mark-

up to account for the costs associated with contracting through a nursing agency, and the assumption that Z.R.'s family could obtain a discounted rate through contract negotiation.

As discussed above, the Court has found that Z.R. requires a higher proportion of RN care than he is currently receiving in order to treat the injuries resulting from his surgery, and that Z.R. will require such services for the remainder of his life. *See supra* Findings of Fact part V.B.1. Indeed, Plaintiffs are "not required to choose the cheapest care and treatment, but may select from among a number of reasonable alternatives." *Muenstermann*, 787 F. Supp. at 523. Where Z.R.'s current mix of 70 percent LPN and 30 percent RN care is insufficient to meet his needs, the Court will award damages relating to future nursing expenses based on 50-50 split, which translates to a rate of $61.87 per hour, the midpoint of the cost range provided by Dr. Davis. This rate is reasonable and necessary to provide an adequate mix of RN and LPN care for Z.R.'s medical needs.

Dr. Davis's lifecare plan for Z.R. also identifies the need for physical therapy, occupational therapy, speech therapy, and assistive technology such as eye gaze communication technology. *See* Ex. 17.1 at 2. As Dr. Nelson testified, such therapies are necessary to maintain or improve Z.R.'s cognitive and motor functions, prevent regression of his remaining abilities, improve Z.R.'s quality of life, and enable Z.R. to experience a degree of communication with his mother and father. Indeed, Dr. Nelson's own estimate of Z.R.'s life expectancy was contingent upon Z.R. gaining access to the types of therapy contained in Dr. Davis's plan. The Government's expert, Dr. Katz, while agreeing that Z.R. should receive these therapies once per week, has taken the position that Z.R. should also seek out any therapy provided by his local school system and that at age 12, Z.R.'s progress should be reevaluated to determine whether he should receive only those services that are provided by the school system. However, the Government has provided no

evidence of what services the local public school system could provide to Z.R., or the value of such services, and therefore has provided no basis to offset these benefits. *See Scott v. United States*, 884 F.2d 1280, 1284 (9th Cir. 1989) (rejecting a proposal to reduce a future medical services award based on the availability of free state therapy programs where the Government failed to present any evidence of the value of the available state services). Accordingly, the Court concludes that the expenses associated with physical, occupational, and speech therapy, as well as relevant assistive technology, as outlined in Dr. Davis's lifecare plan are reasonable and necessary for Z.R.

Lastly, as stated in the Findings of Fact, Plaintiffs' proposed future medical expenses also include the cost of various medications, medical equipment, renovations, and devices necessary for Z.R.'s care, including a Vagus Nerve Stimulator, Baclofen Pump, wheelchairs, special beds, and mechanical lifts, among other items. Items such as medications, special medical equipment, and therapeutic services have been included as part of future medical expense awards in other FTCA cases. *See Muenstermann*, 787 F. Supp. at 522 n.4 (citing cases). The Court finds that Plaintiffs' requests for these items are reasonable and necessary to meet Z.R.'s future medical care needs.

As with future earnings, the Court finds that Dr. Borzilleri's method of calculating the net present value of Z.R.'s future medical expenses is appropriate. *See supra* Conclusions of Law part IV.A; Ex. 19.2. Accordingly, where Plaintiffs' requests for future medical expenses consisting of nursing care, therapy, and other medical expenses are reasonable and necessary, the Court will award $11,626,161 for this category, less any offsets or reductions, as discussed below.

### 2.    TRICARE Offset

The Government argues that the Court should reduce the amount of future medical expenses by the amount of expenses to be paid by TRICARE on behalf of Z.R. on the grounds that TRICARE benefits are not a collateral source. *See Mays v. United States*, 806 F.2d 976, 977 (10th Cir. 1986). Maryland law permits "an injured person to recover in tort the full amount of his provable damages regardless of the amount of compensation which the person has received for his injuries from sources unrelated to the tortfeasor," known as collateral sources. *Motor Vehicle Admin. of the Md. Dept. of Transp. v. Seidel Chevrolet, Inc.*, 604 A.2d 473, 481 (Md. 1992). Because TRICARE payments come from the general revenues of the United States government, most courts to consider the issue have determined that "such payments are not from a source collateral to the United States" and accordingly have offset damages to avoid double recovery of medical expenses covered by the TRICARE Program. *Mays*, 806 F.2d at 977; *see Burke*, 605 F. Supp. at 993. In *Mays*, the court reduced an FTCA damages award by the value of benefits already paid by the CHAMPUS program, the predecessor program to TRICARE. *Mays,* 806 F.2d at 978. In *Burke*, the court limited the damages award for future medical expenses to 25 percent of future medical expenses to avoid double recovery where the plaintiff's husband had already retired from the military and thus was guaranteed to have future TRICARE benefits covering all but 25 percent of medical expenses of the plaintiff. *Burke*, 605 F. Supp. at 994.

Unlike in *Mays* or *Burke*, however, Plaintiffs do not seek recovery for past medical expenses, and they will not be eligible for continued TRICARE coverage when Sgt. Reese leaves the military. Sgt. Reese testified at trial that he intends to leave the military at the end of his enlistment period in April 2023, well before achieving the 20 years of service necessary to secure guaranteed TRICARE benefits for himself and his family in retirement. The Court therefore finds

that offsetting Z.R.'s damages award by the amount of TRICARE benefits expected to be received after April 2023 would be contrary to the evidence since such benefits will likely never be received. *See Lawson*, 454 F. Supp. 2d at 415 (declining to offset an FTCA damages award by the value of future TRICARE benefits on the grounds that receipt of such benefits was "speculative" even where the plaintiff's husband testified that it was "his goal" to remain in the military for another six and a half years until he had served the 20 years required to obtain lifetime benefits). However, because Sgt. Reese's testimony establishes with reasonable certainty that he will remain in the military and thus remain eligible for TRICARE coverage through the remainder of his enlistment period, the value of TRICARE benefits to be paid until April 2023 will be deducted from the damages awarded for Z.R.'s medical expenses to avoid double recovery from a non-collateral source for this limited period of time.

### C.    Other Damages

In addition to Z.R.'s lost future earnings and future medical expenses, Plaintiffs also seek damages relating to Ms. Harris-Reese's care of Z.R., a Maryland Medicaid lien incurred to support Z.R.'s care, and noneconomic damages suffered by Z.R.

#### 1.    Parental Care

Plaintiffs seek compensation for the cumulative value of Ms. Harris-Reese's past care of Z.R. from July 21, 2017 to the start of the trial on March 21, 2022. Maryland recognizes the right to recover for the value of material services rendered to an injured plaintiff. *See Lester v. Dunn*, 475 F.2d 983, 985-86 (D.C. Cir. 1973) (holding that under Maryland law, "when a minor is injured his mother is entitled to recover for the care and labor of nursing him"); *Muenstermann*, 787 F. Supp. at 522-23. Even gratuitously furnished medical care and treatment are recoverable. *See Plank v. Summers*, 102 A.2d 262, 266-67 (Md. 1954); *Muenstermann*, 787 F. Supp. at 523. As

stated in the Findings of Fact, because the nursing service agency has been routinely unable to meet Z.R.'s needs, Ms. Harris-Reese, who has nursing training and was a CNA, has provided care to Z.R for an average of 22 hours per week since July 21, 2017. This care may be compensated through damages. Although Dr. Borzilleri calculated such damages using the midpoint of Dr. Davis's range of $43.75 to $80.00 per hour for skilled nursing services, the Court agrees with the Government that this midpoint rate of $61.87 per hour is unduly excessive where Ms. Harris-Reese is not a licensed nurse. *See Lester*, 475 F.2d at 986 (under Maryland law, using a parent's "loss of wages" as the appropriate measure of damages based on parental care). Accordingly, the Court concludes that Ms. Harris-Reese's care is reasonably valued at Dr. Davis's low-end rate of $43.75 per hour and applied to an average of 22 hours per week for 243 weeks, resulting in a total value of $233,887.50.

### 2.    Medicaid Lien

Any settlement or judgment from this action is subject to a Maryland Medicaid lien in the amount of $27,127.61 for past expenses paid by Maryland Medicaid for treatment of injuries related to Z.R.'s surgery. Under the Medicaid program, state agencies administering Medicaid must "take all reasonable measures to ascertain the legal liability of third parties" and to ensure that those entities "pay for care and services available under the plan." 42 U.S.C. § 1396a(a)(25)(A). In cases against the United States, courts have awarded the amount of a Medicaid lien as a damage award for past medical expenses. *See, e.g., Bravo v. United States*, 403 F. Supp. 2d 1182, 1200 n.13 (S.D. Fla. 2005) ("[T]he amount of the Medicaid lien for past payments is recoverable against Defendant United States of America.") Accordingly, the Court will award Plaintiffs $27,127.61 to satisfy the Maryland Medicaid lien for Z.R.'s past medical expenses.

### 3.   Noneconomic Damages

Z.R.'s physical pain and suffering may be considered as an element of damages. *Greenstein v. Meister*, 368 A.2d 451, 461 (Md. 1977).   Similarly, Z.R.'s mental and emotional suffering and anxiety as a result of the injuries and their future consequences, as well as the loss of Z.R.'s ability to enjoy the usual and familiar tasks of life, may be considered. *See Lawson*, 454 F. Supp. 2d at 424 (citing *White v. Parks*, 140 A. 70, 72–73 (Md. 1928), and *McAlister v. Carl*, 197 A.2d 140, 146 (Md. 1964)).   Finally, the permanency of Z.R.'s injuries is an acceptable basis for awarding nonpecuniary damages.   *See Katz v. Holsinger*, 286 A.2d 115, 121 (Md. 1972); *Lawson*, 454 F. Supp. 2d at 424.

Here, there can be no dispute that Z.R.'s injuries have caused and will continue to cause Z.R. physical and emotional pain and suffering for the remainder of his life and prevent him from ever living independently.   *See supra* Findings of Fact part V.A.   Taking these factors into consideration, the Court concludes that Z.R.'s noneconomic damages would significantly exceed the Maryland medical malpractice damages statutory maximum of $770,000 in noneconomic damages. Md. Cts. & Jud. Proc. Code Ann. § 3-2A-09 (West 2020); *see, e.g., Muenstermann*, 787 F. Supp. at 527 (in a 1992 case, finding that $800,000 was appropriate nonpecuniary compensation for permanent and severe brain injury).   The Court will therefore award $770,000 in noneconomic damages.

## CONCLUSION

For the foregoing reasons, the Court finds the Government liable on the FTCA medical negligence claim relating to Z.R.'s surgery and will enter judgment in favor of Plaintiffs on that claim. Damages will be awarded as set forth in the accompanying Order.

Date: July 20, 2022



THEODORE D. CHUANG
United States District Judge

62